In the Supreme Court of Georgia

Decided: October 20, 2014

S14P0819.  HULETT v. THE STATE.

HUNSTEIN, Justice.

A jury convicted Donnie Allen Hulett of two counts of malice murder and numerous related crimes, and Hulett waived his right to a jury trial as to sentencing for the murders.  At the conclusion of a bench trial on sentencing, the trial court found the existence of multiple statutory aggravating circumstances and sentenced Hulett to death for each of the murders.  See OCGA §§ 17-10-30 (b), 17-10-31 (a).  Hulett's motion for new trial was denied, and he appeals his

convictions and sentences.[1]  For the reasons set forth below, we affirm in part

and vacate in part.

<u>Sufficiency of the Evidence</u>

1.  The evidence presented at trial showed the following.  On July 22,

2002, between 8:30 and 9:30 a.m., the assistant director of the Mountain Top

Boys Home in LaFayette saw brothers Larry and Arvine Phelps drive onto the

home's property in Larry Phelps' red Ford F-150 pickup truck.  Both brothers

were retired educators, and they had volunteered to cut trees and clear an area

for a new building for the home.  At approximately 10:30 a.m., the assistant

---

[1] The crimes occurred on July 22, 2002.  Hulett was indicted by a Walker County grand jury on November 5, 2002, on two counts of malice murder, six counts of felony murder, two counts each of armed robbery and aggravated assault, four counts of possession of a firearm during the commission of a crime, and one count of possession of a firearm by a convicted felon.  He was re-indicted on the same counts on March 2, 2004. The State filed written notices of its intent to seek the death penalty on November 22, 2002, and on March 12, 2004.  Jury selection began on April 12, 2004.  On April 22, 2004, the jury returned a verdict of guilty on all counts of the indictment.  Hulett waived his right to a jury trial on sentencing for the murders, and a bench trial was conducted on April 28 and 29, 2004.  On April 29, 2004, the trial court sentenced Hulett to death for each of the malice murder convictions, and the felony murder convictions were vacated by operation of law. See <u>Malcolm v. State</u>, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993); OCGA § 16-1-7 (a).  As to the counts for firearm possession during a crime, the trial court merged the counts involving each victim and sentenced Hulett to two five-year sentences to be served consecutive to one another and to the death sentences.  As further discussed in Division 2, infra, the trial court determined that the remaining counts merged into other counts for sentencing purposes.  Hulett filed a motion for new trial on May 28, 2004, which he amended on December 26, 2012, and which the trial court denied on February 12, 2013.  Hulett filed a notice of appeal on March 4, 2013.  After the appeal was docketed in this Court, it was stricken, and the record was returned to the trial court for completion of the record.  The instant appeal was docketed for the April 2014 term of this Court and was orally argued on May 19, 2014.

2

director and boys from the home were headed to the post office in the home's van when they noticed a white Chevrolet Cavalier that was parked on the side of the road a few hundred yards past the home's driveway. They saw a white male near the automobile. Two boys in the van had also separately seen the Cavalier in the same spot the evening before, and one of the boys had noticed steam coming from the Cavalier and a white male standing at the automobile's open hood, indicating that the Cavalier had broken down.

When returning from the post office approximately a half hour later, the home's van met Larry Phelps' truck exiting the driveway, and the assistant director and several of the boys noticed that the truck's driver was not either of the Phelps brothers. Later in the day, one of the home's employees and a boy residing at the home visited the construction site, where they discovered the Phelps brothers' bodies. Law enforcement personnel called to the scene investigated the Cavalier parked nearby. The officers learned that it had been reported stolen the previous evening when its owners returned from out of town and discovered that the vehicle and their daughter's new acquaintance, Donnie "D. J." Hulett, had disappeared from their home in the late night hours of July 20 or the early morning hours of July 21. The couple reported that several other

3

items, including a Smith and Wesson 30.06 rifle, a shotgun, and ammunition, were also missing. Later analysis by a technician at the Georgia Bureau of Investigation ("GBI") Crime Lab showed that two fingerprints lifted from the hood of the Cavalier matched Hulett's fingerprints.

The evidence at the murder scene indicated that the Phelps brothers were approximately 20 yards apart and were cutting trees when Hulett, standing 65 to 70 yards away on a hill above them, fired at Arvine Phelps multiple times with a high-powered rifle. Apparently not realizing the source of his brother's injury, Larry Phelps put down his chainsaw where he was working and ran to his brother's aid. Blood on the knees of his jeans indicated that he kneeled beside his brother to assist him, using his own shirt as a makeshift bandage to control Arvine's bleeding. Meanwhile, Hulett proceeded down the hillside toward the brothers. At some point, Larry Phelps saw Hulett and ran toward his truck for safety, but Hulett shot him from above. Hulett then approached the victims, beat both of them about the head, and took their wallets before leaving in Larry Phelps' truck. According to the medical examiner, Arvine Phelps was shot with a high-powered rifle in his left upper back, left arm, and left thigh. The medical examiner opined that, after Arvine Phelps was shot but while still

4

alive, he suffered severe blunt force trauma to the front of his head while lying on a flat surface, causing "two complete fractures through the brain and the dura" and fractures to the back of the head on the occipital bone. She testified that the attack left Arvine Phelps' brain exposed and "pulpified, meaning it was just smashed, [and] no longer held the contours [of] what a brain should look like." The medical examiner testified that the single projectile that struck Larry Phelps entered the right side of his neck above the collar bone, fractured his ribs, traversed his lung, fractured his spinal cord, and exited his back. She also opined that Larry Phelps received a blunt force injury to the left side of his head after having been shot but prior to his death, and she explained that the blunt force injuries suffered by both of the victims were consistent with the victims' having been struck by a rifle butt or a sledge hammer.

Later during the day of the murders, several of Hulett's acquaintances saw him at various locations in middle Georgia driving a truck bearing the license plate issued for Larry Phelps' truck and matching its description and in possession of a Smith and Wesson 30.06 rifle and a large amount of cash. The GBI subsequently learned from one of Hulett's acquaintances that he had fled to Arizona. On August 2, 2002, authorities apprehended Hulett in a grocery

5

store parking lot near Phoenix. At the time of his apprehension, Hulett was sitting in Larry Phelps' truck, which displayed a stolen Georgia license plate. After Hulett's arrest, detectives discovered a handwritten note in a mileage log located in the glove compartment of Larry Phelps' truck. The note began, "I, Donnie Hulett did do the murders at Mountain Top Boys Home," and it was signed, "Donnie Hulett, aka, D. J." A GBI handwriting examiner concluded that the note was written by Hulett. The handwriting on the note was also authenticated at trial as being that of Hulett by Hulett's maternal grandparents and half-sister. Several witnesses from the Mountain Top Boys' Home identified Hulett from a photographic line-up as being the person that they saw near the Cavalier and driving Larry Phelps' truck. The Smith and Wesson 30.06 rifle was never located, but a GBI firearms examiner testified that a spent shell casing found at the murder scene was fired from the same rifle as seven spent shell casings received from the rifle's owner, who testified that the spent shell casings had been fired from the Smith and Wesson 30.06 rifle before it was stolen. The State also introduced Hulett's prior felony conviction.

After reviewing the evidence in the light most favorable to the jury's verdicts, we conclude that it was sufficient to authorize a rational trier of fact to

find Hulett guilty of the crimes charged beyond a reasonable doubt. See

Jackson v. Virginia, 443 U. S. 307, 318-319 (III) (B) (99 SCt 2781, 61 LE2d

560) (1979); UAP IV (B) (2) (providing that, in all death penalty cases, this

Court will determine whether the verdicts are supported by the evidence).

2. While the evidence was sufficient to support the jury's guilty verdicts,

we have noted an error with respect to the merger of certain counts for judgment

and sentencing. The jury returned guilty verdicts on all 17 counts of the

indictment. The counts relevant to our discussion here are as follows:

Count 1: Malice murder of Arvine Phelps.
Count 2: Malice murder of Larry Phelps.
Count 3: Felony murder of Arvine Phelps (aggravated assault as the underlying felony).
Count 4: Felony murder of Larry Phelps (aggravated assault as the underlying felony).
Count 5: Aggravated assault (assault with a deadly weapon) of Arvine Phelps.
Count 6: Aggravated assault (assault with a deadly weapon) of Larry Phelps.
Count 7: Felony murder of Arvine Phelps (possession of a firearm by a convicted felon as the underlying felony).
Count 8: Felony murder of Larry Phelps (possession of a firearm by a convicted felon as the underlying felony).
Count 9: Possession of a firearm by a convicted felon.
Count 10: Felony Murder of Arvine Phelps (armed robbery as the underlying felony).
Count 11: Felony Murder of Larry Phelps (armed robbery as the underlying felony).

7

Count 12:   Armed robbery of Arvine Phelps.
Count 13:   Armed robbery of Larry Phelps.

For sentencing purposes, the trial court "merged" Counts 1, 3, 5, 7, 9, 10, and 12 and separately "merged" Counts 2, 4, 6, 8, 9,[2] 11, and 13. According to the trial transcript, the trial court, at the State's urging, determined that the felony murder counts, along with his convictions for the underlying felonies, "merged" with his malice murder counts as to each respective victim. However, the trial court was incorrect.

First, the trial court erred with respect to the relationship between the malice murder and felony murder counts regarding each of the victims. As this Court has explained, the State may seek guilty verdicts on alternative theories of malice murder and felony murder, and, "[w]hen the elements of malice and an underlying felony both exist in a murder case, the law does not preclude verdicts of guilty of both malice and felony murder." Smith v. State, 258 Ga. 181, 183 (2) (366 SE2d 763) (1988). See Lumpkins v. State, 264 Ga. 255, 256 (3) (443 SE2d 619) (1994) (explaining that the State may indict on alternative counts "for a single crime which may have been committed in more than one

---

[2] The trial court inexplicably "merged" Count 9 twice.

8

way"). However, when a valid guilty verdict is returned on both malice murder and felony murder of the same victim, the defendant should be sentenced for the malice murder, and the alternative felony murder count stands vacated by operation of law as "'simply surplusage.'" (Citation omitted.) Malcolm v. State, 263 Ga. 369, 372 (4) (434 SE2d 479) (1993). See Mills v. State, 287 Ga. 828, 828 n. 1 (700 SE2d 544) (2010) (noting that "the felony murder conviction was properly vacated by operation of law rather than 'merged' into the malice murder conviction" (emphasis supplied) (citing Malcolm, 263 Ga. at 372).

Because the trial court failed to recognize that the felony murder counts were vacated as surplusage rather than "merged" into the malice murder counts, it also failed to recognize that "there [were] no felony murder count[s] into which the underlying felon[ies] c[ould] merge." Malcolm, 263 Ga. at 373. As a result, the trial court improperly determined that certain of the non-murder counts "merged" as a matter of law into the felony murder counts when, instead, the trial court should have "treat[ed] the felony murder count[s] as merely surplusage and then . . . proceed[ed] to determine whether the underlying felon[ies] did or did not merge, as a matter of fact, into the malice murder count[s]." (Emphasis supplied.) Id.

As demonstrated by the discussion below, as a result of the trial court's error, "[Hulett] has yet to be sentenced for [three] of the crimes" of which he was validly convicted. State v. Smith, 193 Ga. App. 831, 832 (1) (389 SE2d 547) (1989) (vacating the trial court's erroneous judgment merging eight of twelve armed robbery counts into four counts and remanding for resentencing on the eight remaining counts). Therefore, that portion of the trial court's judgment is illegal and void. See Williams v. State, 271 Ga. 686, 688 n. 7 (1) (523 SE2d 857) (1999) (noting that an illegal sentence may benefit a criminal defendant but that a judgment imposing a sentence that the law does not allow is still void and that the trial court may resentence the defendant at any time, citing Hartman v. State, 266 Ga. 613 (5) (469 SE2d 163) (1996) (holding that the trial court's judgment imposing a concurrent rather than a consecutive sentence as required by the governing statute was void and could be amended to conform to the law at any time)). The State, had it chosen to do so, could have "appeal[ed] directly the failure of the trial court to legally impose sentences for those [three] crimes."[3] Smith, 193 Ga. App. at 832. See OCGA § 5-7-1 (a)

---

[3] To the extent that Gibbins v. State, 229 Ga. App. 896, 901-902 (8) (495 SE2d 46) (1997), holds to the contrary, it is overruled.

(6) (authorizing the State to appeal "[f]rom an order, decision, or judgment of a court where the court does not have jurisdiction or the order is otherwise void under the Constitution or laws of this state"); State v. Sumlin, 281 Ga. 183, 184 (2) (637 SE2d 36) (2006) (holding that the State is entitled to directly appeal a "legally void" order); State v. Jones, 265 Ga. App. 493, 493 (1), 494 (2) (594 SE2d 706) (2004) (noting that "[t]he law is clear that the state is authorized to appeal a void sentence," holding that the probated portion of the defendant's sentence was contrary to the applicable statute and thus was void, and remanding for resentencing); State v. Dixon, 194 Ga. App. 146, 146 (1) (390 SE2d 600) (1990) (vacating the trial court's judgment erroneously merging the defendant's armed robbery counts and remanding for resentencing on each of the counts).  However, neither party has appealed these sentencing errors.[4]

Where neither party properly raises and argues a merger issue, this Court has no duty "to scour the record searching for merger issues."  Nazario v. State, 293 Ga. 480, 488 (2) (d) (746 SE2d 109) (2013).  However, if we notice a

---

[4] Obviously, Hulett has no reason to complain about these sentencing errors on appeal, as they do no harm to him.  The record clearly shows that the State induced the error, which may explain the State's failure to appeal; however, "[i]nduced error cannot serve to render a void judgment valid."  Jackson v. State, 276 Ga. 408, 410 n. 2 (2) (577 SE2d 570) (2003).

11

merger issue in a direct appeal, as we have here, we regularly resolve that issue, "even where [it] was not raised in the trial court and is not enumerated as error on appeal." Id. at 486 (2) (b) (explaining that a judgment of sentence is void where it imposes an illegal sentence, i.e., a sentence that the law does not allow, and that the illegality of such a judgment is not a waivable issue). The merger issues that this Court decides sua sponte typically result in vacated convictions and sentences and thus are favorable to the defendant. See id. (listing cases). Nevertheless, we agree with the Court of Appeals that "an accused who has been convicted of a crime has neither a vested right to nor a reasonable expectation of finality as to a pronounced sentence which is null and void." Bryant v. State, 229 Ga. App. 534, 535 (1) (494 SE2d 353) (1997). See OCGA § 17-9-4 ("The judgment of a court having no jurisdiction of the person or subject matter, or void for any other cause, is a mere nullity and may be so held in any court when it becomes material to the interest of the parties to consider it.").

Accordingly, having noticed the trial court's error, we vacate that portion of the trial court's sentencing order in which it "merged" Counts 1, 3, 5, 7, 9, 10, and 12 with one another and "merged" Counts 2, 4, 6, 8, 9, 11, and 13 with one

12

another.[5]  As discussed in Division 1, there was sufficient evidence to convict Hulett of the malice murders of Arvine Phelps and Larry Phelps.  Therefore, the trial court properly sentenced him on Counts 1 and 2, and Counts 3, 4, 7, 8, 10, and 11, which are the felony murder counts, are vacated by operation of law.  See Malcolm, 263 Ga. at 371-372.  We now proceed to determine whether Counts 5, 6, 9, 12, and 13 merge as a matter of fact into the valid malice murder convictions.

(a) We begin with Counts 5 and 6, which charged Hulett with committing aggravated assault "with a deadly weapon, a rifle, by pointing said firearm at said victim. . . ."  There was no evidence presented that authorized the jury to find that Hulett's aggravated assault of either victim by pointing the gun at them was not "followed almost immediately" by the fatal shooting of the victims or that there existed "a deliberate interval" between the two events.  Solomon v. State, 293 Ga. 605, 606 (1) (748 SE2d 865) (2013).  Therefore, the aggravated assaults merge as a matter of fact into the malice murder.  See id.

_____

[5] In so doing, we disapprove the dicta in Wright v. State, 243 Ga. App. 167, 169, n.2 (532 SE2d 724) (2000) indicating that an appellate court should decline to review a void sentence where the State has failed to appeal it.

(b) Count 9 charged Hulett with the offense of possession of a firearm by a convicted felon. "[P]ossession of a firearm by a convicted felon does not merge into a conviction for malice murder." Chester v. State, 284 Ga. 162, 162 (1) (664 SE2d 220) (2008), overruled on other grounds by Williams v. State, 287 Ga. 192, 194 (695 SE2d 244) (2010), and Harper v. State, 286 Ga. 216, 218 (1) (686 SE2d 786) (2009). Therefore, as no merger occurred, Hulett should have been sentenced on this count.

(c) Count 12 charged Hulett with the offense of armed robbery in that he did, "with the intent to commit theft, take a 2000 Ford F-150 XLT pickup, from the immediate presence of Arvine Phelps by the use of a 30.06 Smith and Wesson rifle, an offensive weapon. . . ." Count 13 charged Hulett with committing armed robbery in the same manner with respect to Larry Phelps. These counts do not merge into the malice murder counts "because malice murder has an element that must be proven (death of the victim) that armed robbery does not, and armed robbery has an element (taking of property) that malice murder does not." Culpepper v. State, 289 Ga. 736, 739 (2) (b) (715 SE2d 155) (2011). Furthermore, the evidence was sufficient to show that both Phelps brothers were subjected to Hulett's exercise of actual force by the use of

14

an offensive weapon so as to induce the relinquishment of another's property. See OCGA § 16-8-41 (a) ("A person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon"). Where two victims are robbed, the defendant may be charged with, convicted of, and sentenced for the robbery of each victim. See Favors v. State, 265 Ga. 433, 433 (1) (457 SE2d 565) (1995) (finding the evidence sufficient to support convictions and sentences for murder and two armed robbery counts where the defendant and his co-defendant followed the murder victim's vehicle to steal it and where, when the victim stopped, the defendant pointed a gun at the victim's passenger, ordered him to the ground, entered the passenger side, ordered the victim out of the vehicle, and then shot and killed the victim and drove off).

(d) In sum, in addition to the sentences actually imposed by the trial court, Hulett also should have been sentenced for the possession of a firearm by a convicted felon count as provided in OCGA § 16-11-131 and for both counts of armed robbery as provided in OCGA § 16-8-41. Accordingly, we remand the case for resentencing on Counts 9, 12, and 13.

15

## Issues Regarding Representation by Counsel

3. On September 5, 2002, the trial court appointed Steve Moore as lead counsel and Larry Hill as co-counsel to represent Hulett. Hulett contends that the trial court committed reversible error by denying his request at an ex parte hearing on July 22, 2003, to remove Hill and replace him with new counsel. An indigent defendant in Georgia does not have an absolute right to the attorney of his own choosing; rather, the choice of appointed counsel is a matter of the trial court's discretion. See Davis v. State, 261 Ga. 221, 222 (403 SE2d 800) (1991). A trial court abuses its discretion in denying a defendant's request to appoint his preferred counsel only when the defendant's choice "is supported by objective considerations favoring the appointment of the preferred counsel, and there are no countervailing considerations of comparable weight." Id.

In support of his request for Hill's dismissal and the appointment of new counsel, Hulett told the trial court that he had seen Hill "a total of four times," felt that Hill "[wa]s not doing his job," was concerned about what Hill would "do for [him] in court," and could not trust Hill, as Hill had told him "several lies." However, Hulett was unable to provide the trial court with a single specific instance in which Hill had been untruthful. Instead, Hulett generally

16

accused Hill of failing "to come see [him]" and failing "to talk[]" with Moore. Hill, in turn, explained to the trial court that, while there had been times when he was prevented from attending a scheduled meeting with Hulett due to last-minute issues at his office, he had never intentionally lied to Hulett. Hill also explained that he and Moore had agreed to temporarily suspend their weekly meetings regarding Hulett's case due to their vacation schedules and the fact that Moore was involved in a trial at the time.

In weighing the considerations that Hulett provided in support of his request, the trial court explained to him that the court considered both of his attorneys "excellent" lawyers, pointing out that they were trained and experienced in death penalty litigation and that Hulett did not "necessarily have to like [Hill]" or be "friends" with him in order to be effectively represented by him. The trial court also inquired as to whether Hulett had any complaints about lead counsel Moore, and Hulett indicated that he was pleased with Moore. After reviewing the time sheets that trial counsel had submitted for payment of attorney's fees, the trial court also told Hulett that both Moore and Hill were "very actively representing [him] along with [his] investigator" and that, while the court was willing to schedule a hearing to hear any further complaints, there

17

was no basis upon which to grant his request at that time and, therefore, it was denied.[6]

The trial court appropriately weighed the considerations favoring Hulett's request and properly concluded that they did not outweigh the countervailing considerations that Hill had completed a significant amount of work on the case and that removing him would delay the trial while a new death-qualified attorney was procured and allowed time to become familiar with the case. See Morris v. Slappy, 461 U. S. 1, 14 (IV) (103 SCt 1610, 75 LE2d 610) (1983) (rejecting "the novel idea that the Sixth Amendment guarantees an accused a 'meaningful attorney-client relationship'"); Smith v. State, 273 Ga. 356, 357 (2) (541 SE2d 362) (2001) (stating that the Sixth Amendment "guarantee[s] effective assistance of counsel, not . . . preferred counsel or counsel with whom a 'meaningful relationship' can be established" (citation and punctuation omitted)); Chapel v. State, 264 Ga. 267, 269-270 (3) (c) (443 SE2d 271) (1994

---

[6] Although the trial court encouraged Hulett to bring any other complaints about Hill before the court, informed him that he could talk to Moore regarding an appeal of the court's denial of his request, and gave him an opportunity to express his dissatisfaction with counsel at every hearing and repeatedly during trial, the record shows that Hulett never again complained about Hill to the trial court until the motion for new trial. Nor did Hulett include the trial court's denial of his request to dismiss Hill and replace him with new co-counsel among the issues that he requested the trial court to certify for interim review by this Court. See OCGA § 17-10-35.1.

18

("The amount of time and effort expended by an attorney on behalf of a criminal defendant are weighty considerations in determining whether that attorney should be appointed to represent the defendant."); Amadeo v. State, 259 Ga. 469, 470 (1) (384 SE2d 181) (1989) (stating that an appointing trial court must "consider the prior experience of the available lawyers when choosing counsel in a death penalty case"). Moreover, the denial of Hulett's request did not leave him without trusted counsel, as Moore remained on the case throughout trial. See Grant v. State, 278 Ga. 817, 817 (1) (607 SE2d 586) (2005) (noting "the strong interest of the defendant and of the court system in sustaining an existing, close relationship between a death penalty defendant and his counsel"). Thus, because Hulett's personal preference as to co-counsel was not supported by objective considerations that outweighed countervailing considerations, the trial court did not abuse its discretion in denying Hulett's request. See Amadeo, 259 Ga. at 470 (holding that an indigent defendant's preference for a particular attorney is a consideration but "not a determinative factor requiring the appointment of that attorney").

4. One year after new lead counsel and new co-counsel were appointed to represent Hulett in his post-conviction proceedings and had filed Hulett's

19

motion for new trial, Hulett filed a motion requesting the trial court to reappoint trial counsel Moore to represent him. He contends in this appeal that the trial court erred in denying his motion because he trusted Moore and had a good working relationship with him, which were the grounds for his motion in the trial court. However, Hulett also contends in this appeal that the trial court erred in denying his motion because Moore was familiar with the case, was in a better position to detect and argue the trial court's errors than new counsel, and had already conducted the relevant research, which would have allowed the case to proceed more quickly. However, an appellant is "limited on appeal to the grounds which he properly presented in the trial court." Lundy v. State, 119 Ga. App. 585, 587 (1) (168 SE2d 199) (1969). In any event, we do not find compelling any of the factors that Hulett now alleges favored the reappointment of trial counsel to represent him in his motion for new trial.

Although Moore would have researched trial issues in his capacity as trial counsel, several issues raised in Hulett's motion for new trial and direct appeal concern post-conviction matters, and there is nothing in the record to indicate that Moore ever conducted any research specifically relevant to the motion for new trial, as he never represented Hulett in that proceeding. Hulett has also

20

failed to show how Moore's reappointment to his case would have resulted in a more expeditious motion for new trial proceeding. In fact, at the November 3, 2011, hearing, which was scheduled by the trial court to hear Hulett's motion and to determine the status of the case, Hulett's post-conviction counsel told the court that she had read the transcript and was ready to proceed on the motion for new trial. However, she explained that the difficulty in finding a time to conduct the hearing on Hulett's motion to reappoint Moore that would accommodate the schedules of all the attorneys involved had actually delayed the new trial hearing. As to Hulett's contentions regarding his good relationship with Moore and Moore's familiarity with his case, it is true that, under certain circumstances, this Court has found similar considerations significant enough to outweigh countervailing considerations in cases involving the denial of a defendant's request to retain trial counsel. See Davis, 261 Ga. at 222 (finding preferred counsel's familiarity with the case and long-standing relationship with the defendant "weighty considerations" where the case was "legally and factually complex" and where a contention was made that the defendant was "in a fragile state of mind"). However, we do not find such considerations as

21

persuasive in post-conviction proceedings where the bulk of counsel's work is with the record under review.

Moreover, in denying Hulett's motion, the trial court found that Hulett's current counsel had announced their intention to raise issues of ineffective assistance of trial counsel in the motion for new trial. Hulett disputes this finding, but it is not clearly erroneous, as his post-conviction counsel stated that, if Moore were not reappointed, they would be litigating trial counsel's ineffectiveness in the motion for new trial.

As this Court has previously observed,

> "[i]t is a requisite of a sound system of criminal justice, serving alike the proper ends of defendants and the public, that any contention concerning the violation of the constitutional right of counsel should be made at the earliest practicable moment." [Cit.] Over the years, this Court has developed a policy of affording initial review by the trial court of a claim of ineffective assistance of counsel . . . in the belief "the claim can be promptly resolved by the judge who presided over the trial as opposed to having it resolved by a habeas court somewhere down the road." [Cit.]

Hood v. State, 282 Ga. 462, 463 (651 SE2d 88) (2007). See Massaro v. United States, 538 U. S. 500, 506 (123 SCt 1690, 155 LE2d 714) (2003) (noting that a judge hearing claims of ineffective assistance of counsel who also presided at trial "should have an advantageous perspective for determining the effectiveness

22

of counsel's conduct and whether any deficiencies were prejudicial"). Therefore, we cannot say that the trial court abused its discretion in denying Hulett's request in order that the issues of ineffective assistance of counsel could be raised at the "'earliest practicable moment.'" Garland v. State, 283 Ga. 201, 202 (657 SE2d 842) (2008) ("By 'earliest practicable moment,' we mean that the ineffectiveness claim must 'be raised before appeal if the opportunity to do so is available.'" (citation omitted)). Compare Grant, 278 Ga. at 818 (finding an abuse of discretion where the trial court removed a death penalty defendant's existing trial counsel in order to ensure the participation of local counsel).

5. Hulett contends that, in denying the motion for new trial, the trial court erred by rejecting his claim that his trial counsel rendered ineffective assistance in the sentencing phase in several respects. In order to prevail on this claim, Hulett must show that counsel's performance was deficient and that actual prejudice to his defense resulted. See Strickland v. Washington, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984); Smith v. Francis, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985). "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." (Emphasis

23

supplied.) Strickland, 466 U. S. at 687 (III). Therefore, in reviewing an ineffective assistance of counsel claim, "this Court need not analyze the deficient performance prong if the Court determines the prejudice prong has not been satisfied." Fortson v. State, 280 Ga. 435, 436 (2) (a) (629 SE2d 798) (2006). Finally, "[a]n ineffective assistance of counsel claim is a mixed question of law and fact; we accept the trial court's factual findings unless clearly erroneous, but we independently apply the legal principles to the facts." Barrett v. State, 292 Ga. 160, 167 (3) (733 SE2d 304) (2012).

(a) Hulett's Defense Team. The trial court described Moore and Hill, who were appointed to represent Hulett approximately a month after his arrest, as being "excellent" attorneys in possession of more knowledge in the area of death penalty litigation "than any other set of attorneys in th[e] circuit." Both attorneys had been practicing law for approximately ten years and were highly experienced in criminal defense at the time of their representation of Hulett. Early in the case, trial counsel sought and obtained funds to retain the investigative services of Roy Cooper, a former law enforcement officer, because they were impressed with his investigative work in another death penalty case in which they had been involved.

(b) <u>Trial Counsel's Presentation of Mitigating Evidence</u>. Trial counsel testified at the new trial hearing that Hulett directed them to focus on obtaining an acquittal and had no interest in aiding them in preparing mitigating evidence to be presented in a sentencing phase if he were convicted. In fact, Moore testified that, at the time of trial, Hulett "was adamant about, if he was not going home he wanted to die and not spend the rest of his life, being at that time 20-something years old, in prison," and Hill testified similarly. Trial counsel testified that Hulett considered a bench trial "his best bet" to secure a death sentence, and that, although counsel explained the risks involved in waiving the right to a jury trial on sentencing to Hulett and "strongly advise[d]" him against it, they were unable to dissuade him from making that choice.

At an ex parte hearing shortly before trial, Moore told the trial court that Hulett remained "very adamant" that he wanted to waive his right to a jury trial on sentencing if he were convicted, explaining that Hulett did not want a life or a life without parole sentence if he were convicted and felt that a jury was less likely than the trial court to give him a death sentence. Moore also explained that he and Hill had had several lengthy conversations discussing "the process" with Hulett, including "the role the jury has, the entire issue of mitigation, what

mitigation is[,] . . . [and] how all that comes together." Moore told the trial court that Hulett had been found competent to stand trial by the defense's forensic psychiatrist, and he also expressed his own belief that Hulett was intelligent and competent and that he understood the proceedings. Finally, Moore stated that, although "[t]his was not the attorney's idea," they were "representing [Hulett] in his case, [and] this [wa]s his choice." See Head v. Thomason, 276 Ga. 434, 439 (4) (578 SE2d 426) (2003) ("Whether to waive a jury trial is a strategic decision to be made by an accused after consultation with counsel.") Hulett subsequently waived orally and in writing his right to a jury trial on the issue of sentence.

After the jury returned its verdict of guilty on all counts, the jurors were dismissed. Six days later, the trial court conducted a bench trial on sentencing for the murder convictions. At that time, trial counsel presented the testimony of Hulett's mother, his mother's fiancé, his father, his stepmother, and Dr. Keith Caruso, the forensic psychiatrist retained by the defense to examine Hulett. The testimony of Hulett's family members provided the trial court with an account of Hulett's background, and Dr. Caruso's testimony explained how Hulett's background had impacted his mental health and how the circumstances of

26

Hulett's crimes were mitigated by certain factors in his life. Specifically, the witnesses' testimony showed the following.

Hulett's parents had been married less than a year when he was born. His mother, who was only 16 years old and had already given birth to another child who did not live with her,[7] used marijuana and smoked cigarettes while she was pregnant with Hulett. When Hulett was a baby, his parents fought physically and used marijuana in his presence, even allowing Hulett to "lick the paper to roll the joint." When he was between one and two years old, his mother left his father, taking Hulett with her. They moved from place to place, and his mother never had a steady job and often had no food to feed Hulett. Hulett's father finally located them and tried to see Hulett, but the two men that they were living with "pointed a shotgun at [him]" and "ran [him] off." When Hulett was approximately two years old, his father was finally able to retrieve him after his mother left him with a friend, took a job with the carnival, and left town. Because of the living conditions Hulett had experienced while with his mother, he was accustomed to fending for himself and preferred food "cold out of a can"

---

[7] The testimony also showed that, after Hulett's mother and father divorced, Hulett's mother gave birth to another child, who also did not live with her, further demonstrating her detachment from and lack of involvement with her children.

27

and was even able to open a can of food for himself. Hulett lived the remainder of his childhood years with his paternal grandparents, where Hulett's father also sometimes lived, and he had almost no contact with his mother. Hulett's father continued to use drugs and drink alcohol around him. His grandparents, particularly his alcoholic grandfather who sometimes "ended up in the V.A. Hospital to dry out," also drank in his presence.

Hulett's grandparents passed away when he was approximately 12 years old, and he "[s]eemed to not care anymore" and began skipping school, getting expelled, and running away from home for days at a time. Hulett's father took him to a psychiatrist "several times," and he was admitted to a psychiatric hospital at age 14 after attempting suicide by overdosing on his father's medication. Near that time, his father married a woman who had lived with his father "most" of Hulett's life. She considered Hulett's grandparents too permissive with Hulett, and she described Hulett as having "a love hate relationship" with his mother and as "not [being] okay" with the fact that he did not really know her. She also described her unsuccessful attempts to get help for Hulett, who had begun to inhale gasoline after his suicide attempt, and noted one counselor who showed Hulett how to "huff" gasoline "the right way."

28

Hulett committed various crimes and spent a great deal of time in the youth detention center before eventually landing in prison. When he was released from prison approximately a month before the murders, he moved in with his mother and her fiancé in Tifton. He and his mother's fiancé became "quick friends," and he worked in the fiancé's floor covering business until shortly before the crimes.

Dr. Keith Caruso testified that he conducted a three and a half hour interview of Hulett at the Walker County jail on October 14, 2003, after reviewing Hulett's Southwestern State Hospital records, Central State Hospital records, Telfair County Hospital records, and Georgia Department of Corrections medical records. Dr. Caruso testified that "some past psychiatric histories" in those documents showed that Hulett had been hospitalized three times in psychiatric hospitals and once in a substance abuse treatment program and that he had attempted suicide "between four and six" times. Dr. Caruso explained that Hulett suffered from a number of mental health issues.

Specifically, Hulett had a history of attention deficit disorder as a child, and attempts at treatment had been unsuccessful. He also had a possible learning disability, and he had been placed in a school for behavioral problems.

He was addicted to "various drugs," including methamphetamine and marijuana, and Dr. Caruso testified that, "by [Hulett's] report[,] he was intoxicated on methamphetamine at the time of the offenses." He had a history of depression as a teen and had also had depressive symptoms when Dr. Caruso examined him. Dr. Caruso opined that, while depressive symptoms are sometimes caused by drug and alcohol abuse, the fact that Hulett exhibited those symptoms in jail, where he supposedly was not using drugs or alcohol, suggested that he suffered from major depression. Hulett told Dr. Caruso that "he had been treated with medications commonly used for bi-polar disorder, . . . including Zyprexa, Zoloft and Depakote," but Dr. Caruso testified that "[he] never got those records so [he] c[ould]n't say, for certain that [Hulett] ha[d] bi-polar disorder." Nevertheless, Dr. Caruso explained that it was "certainly [a] possibility and [was] in his report and [that Hulett] certainly did look depressed at th[e] time that [he] saw him." He also testified that, "due in part to [his] dependency problems leading to problems with the law and nonconforming behavior," Hulett "ha[d] an anti-social personality disorder." Likening a personality

30

disorder to "mental retardation"[8] of the personality, Dr. Caruso explained that persons who suffer from a personality disorder "cannot solve complex interpersonal problems" and tend to be unstable in their relationships with others, their emotional states, and their impulse control. Finally, Dr. Caruso noted that he did not see evidence of any neurological impairment, despite Hulett's history of inhalant abuse and his possible learning disability.

In explaining the extent to which Hulett's background and upbringing contributed to his mental health issues, Dr. Caruso testified that Hulett likely would have been prone to problems with substance abuse and impulsive behavior as a result of his "genetic loading," regardless of his childhood environment and upbringing. However, he explained that Hulett's being raised in a very unstable environment, including being abandoned by his mother as a toddler, having very little relationship with his father in his early years, and being primarily raised by grandparents who abused alcohol and who died when he was young, created a "recurrent pattern of loss [and] abandonment." According to Dr. Caruso, Hulett endured "problems with physical and emotional

---

[8] On cross-examination, Dr. Caruso clarified that he was not testifying that Hulett was mentally retarded. He testified that Hulett's IQ score was 108, and he acknowledged that Hulett's score indicated that his intelligence level was "a little above average."

abuse in the home as well," including his father's physical abuse and his own perception that his father was more loyal to his wife than he was to Hulett. Therefore, Dr. Caruso did not find it surprising that Hulett began "getting into trouble after his grandmother's death" and "essentially was institutionalized at that point forward," spending a total of five years in psychiatric hospitals and youth detention facilities "[with] very little time at home." He also noted that Hulett was arrested at age eighteen for auto theft, spent three years in prison, and could not locate his father upon his release just weeks before the murders, which again precipitated feelings of abandonment and stress in him.

Finally, Dr. Caruso opined that Hulett "need[ed] therapy for a number [of problems], including recurrent major depression and possibly bi-polar disorder," and that there were several mitigating factors in Hulett's case, including the following: Hulett's youth and his self-reported intoxication at the time of the crimes, which would have impaired his capacity to appreciate the wrongfulness of his behavior; his depression "syndrome" and the fact that he was acting under extreme emotional disturbance due to the reawakening of earlier abandonment problems created by his parents' repeated absence; his personality structure, which made it difficult for him to cope with these issues; his history of physical

32

abuse, which modeled violence as problem-solving; and his lack of normal coping skills as a result of parental immaturity, neglect and substance abuse in the home, and the instability of the home itself.

On cross-examination, Dr. Caruso acknowledged that, "in some ways," a person with a personality disorder does not get better. However, he opined that environment and treatment could have a positive effect. He explained that, if Hulett received proper treatment for his depression and possible bi-polar disorder, it would positively affect the impact of those conditions on his underlying personality disorder, thereby also improving the chances for that condition's successful treatment. Nevertheless, Dr. Caruso opined that Hulett "w[ould] always have problems with impulsive behavior" and would not be "able to function in society again." In his opinion, Hulett had "a better chance" of conforming his behavior in a highly structured prison environment, and he noted that Hulett's behavior might improve significantly if he were placed on Depakote and anti-psychotic medication, particularly given the possibility that he suffered from bi-polar disorder.

Trial counsel tendered Hulett's prison medical records, which included copies of his records from other hospitals.[9]  In closing argument, trial counsel summarized the evidence about Hulett's background and mental health issues and asked the trial court for mercy, as  discussed in more detail in subdivision (c) (iii) below.

(c) Allegations of Ineffective Assistance.  Hulett contends that trial counsel rendered ineffective assistance in various ways.

(I) Failure to Hire a Mitigation Specialist.  Hulett contends that trial counsel were ineffective in failing to retain a mitigation specialist to assist in the investigation, preparation, and presentation of a mitigation case in the sentencing phase.  In support of this claim, Hulett cites and relies on the 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, which state in pertinent part, that "[t]he defense team should consist of no fewer than two [qualified] attorneys . . ., an

---

[9] By stipulation of the parties, this approximately 300-page exhibit was submitted to the trial court at the end of the guilt/innocence phase six days earlier.  Upon its admission into evidence at the sentencing phase, the trial court informed the parties that the court "ha[d] already reviewed each sheet of that."  Compare Turpin v. Lipham, 270 Ga. 208, 218-219 (3) (B) (4) (510 SE2d 32) (1998) (finding ineffective assistance where trial counsel introduced approximately 2,500 pages of medical, psychological, and social records into evidence, presented no expert to explain the records, and exhorted the jury to read the documents during deliberations).

34

investigator, and a mitigation specialist." ABA Guidelines for the Appointment

and Performance of Defense Counsel in Death Penalty Cases § 4.1 (A) (1) (rev.

ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 952 (2003).[10]

The Supreme Court of the United States has employed the ABA

Guidelines for the Appointment and Performance of Counsel in Death Penalty

Cases as guides in determining the level of reasonable performance for counsel

in a capital case. See Wiggins v. Smith, 539 U. S. 510, 524 (II) (B) (1) (123 SCt

2527, 156 LE2d 471) (2003) (citing to the ABA's 1989 Guidelines as evidence

of the professional standards that prevailed in Maryland in 1989); Strickland,

466 U.S. at 688 (III) (A) (stating that "[p]revailing norms of practice as reflected

in American Bar Association standards and the like . . . are guides to

determining what is reasonable"). See also Hall v. McPherson, 284 Ga. 219,

---

[10] In his brief to this Court, Hulett also quotes subsection (2) of this guideline, which provides that "[t]he defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 4.1 (A) (2). However, the guidelines recognize that this member may be one of the team members named in Guideline 4.1 (A) (1) or an additional person. See id. at 10.4 (C) (2) Commentary, reprinted in 31 Hofstra L. Rev. at 1003. Thus, to the extent Hulett contends that trial counsel rendered ineffective assistance by not adhering to this guideline, we note that, as trial counsel retained a well-credentialed forensic psychiatrist whose testimony at trial shows that he conducted a comprehensive mental evaluation of Hulett, trial counsel complied with this guideline.

221 n. 6 (2) (663 SE2d 659) (2008) (recognizing the Supreme Court's use of the ABA Guidelines as "'guides to determining what is reasonable'" when measuring trial counsel's mitigation investigation (citing Wiggins, 539 U. S. at 524 (II) (B) (1) (quoting Strickland, 466 U. S. at 688 (III) (A))); Franks v. State, 278 Ga. 246, 261 (2) (B) (7) (599 SE2d 134) (2004) (same). However, the ABA Guidelines "'are only guides' in determining the reasonableness of counsel's performance, as no set of rules can adequately allow for 'the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.'" Hall v. Lee, 286 Ga. 79, 81 n. 1 (II) (B) (2) (684 SE2d 868) (2009) (quoting Strickland, 466 U. S. at 688-689 (III) (A), and supplying emphasis).

Moreover, the Supreme Court recently reiterated that the ABA Guidelines are "not [the] definition" of attorney reasonableness and should not be treated by lower courts as "inexorable commands with which all capital defense counsel 'must fully comply'" or as constitutionally mandated rules that must govern a court's Strickland analysis, as the Federal Constitution requires only that

counsel make objectively reasonable choices.[11]  Bobby v. Van Hook, 558 U. S.

4, 8-9 (II) (A) (130 SCt 13, 175 LE2d 255) (2009).  Invoking a rigid

requirement that trial counsel must employ a mitigation specialist in order to

effectively represent a defendant in a capital case would effectively revoke the

presumption that trial counsel's actions based upon strategic decisions are

reasonable and would also "interfere with the 'constitutionally protected

independence of counsel' at the heart of Strickland."  (Citation omitted.)

Wiggins, 539 U. S. at 533 (emphasizing that Strickland does not require counsel

to investigate every conceivable line of mitigating evidence or to present

mitigating evidence in every case).  Thus, we conclude, as several other courts

have, that the failure to hire a mitigation specialist does not necessarily demand

a finding of deficient performance.  See, e.g., State v. Osie, No. 2010-1105,

2014 WL 3360616, at * 37 (Ohio July 10, 2014); Hoskins v. State, 75 S3d 250,

256 (II) (B) (Fla. 2011); Daniel v. State, 86 S3d 405, 437-438 (IV) (J) (Ala.

Crim. App. 2011).

---

[11] The Supreme Court explained that the proper use of the guidelines in Strickland analysis requires that they "reflect prevailing norms of practice, and standard practice, and [ ] not be so detailed that they would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." (Citations and punctuation omitted.)  Van Hook, 558 U. S. at 8 n. 1.  The Supreme Court expressly withheld its opinion as to whether the 2003 ABA Guidelines meet those criteria.  Id.

Accordingly, to meet the first prong of Strickland, Hulett must show that trial counsel's decision not to retain a mitigation specialist was objectively unreasonable under the circumstances facing counsel at the time. See Turpin v. Lipham, 270 Ga. 208, 217 (3) (B) (4) (510 SE2d 32) (1998) (stating that the test for determining deficient performance in the sentencing phase is whether "some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial" (citation and punctuation omitted)). In making this showing, Hulett "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (Citation omitted.) Strickland, 466 U. S. at 689.

At the new trial hearing, trial counsel testified that they investigated the case for potential mitigating evidence, despite Hulett's desire to die if he were convicted and his disinterest in having trial counsel conduct any investigation into mitigating evidence. See Barrett, 292 Ga. at 185 (finding that, while the wording of the relevant ABA Guideline had changed, this Court's prior holding that "'reasonable attorney performance includes investigating mitigating evidence to the extent feasible given the defendant's willingness to cooperate and then, if the defendant insists, following his instructions regarding the

38

ultimate defense to pursue,'" was still applicable to the defendant's case (quoting Perkins v. Hall, 288 Ga. 810, 815 (II) (A) (708 SE2d 335) (2011)). Trial counsel stated that they decided to assign the mitigation investigation to Cooper, their experienced investigator. Moore explained that trial counsel chose Cooper to conduct the mitigation investigation because they had previously had "issues" with mitigation specialists they had retained "doing their jobs" in another death penalty case. Moore also testified that he had found that the "fancy title" of mitigation specialist often made people "reluctant to talk," particularly in areas outside Atlanta like those involved in Hulett's case. Moore testified that he considered Cooper capable of conducting the same investigation as a mitigation specialist without the "fancy title," and he explained that, in another capital case in which he was involved, Cooper had located mitigating documents that led the State to withdraw notice of its intent to seek the death penalty.

Trial counsel's files were not admitted at the new trial hearing, and Hulett's post-conviction counsel did not ask trial counsel to list which potential mitigation witnesses were interviewed. Furthermore, during their testimony at the new trial hearing, both trial attorneys had difficulty recalling whether

39

specific persons were interviewed as potential mitigation witnesses. However, trial counsel testified that their investigator "spent several days" in the area where Hulett grew up interviewing potential mitigation witnesses and that trial counsel eventually decided that having Hulett's parents testify would be the most effective way to present the facts of Hulett's background. See Whatley v. Terry, 284 Ga. 555, 566 (V) (A) (668 SE2d 651) (2008) (stating that it was "entirely reasonable" for trial counsel to delegate an investigation into potential witness testimony to his investigator and to follow up when it appeared prudent to do so). Moore explained that, in his view, having Hulett's mother and father testify "to all those [mitigating] things" regarding Hulett's upbringing, including that he "was constantly around drugs" and that his parents "did drugs in his presence," was much more effective than "second hand information from someone [else]."

The defense team also obtained Hulett's medical records from Southwestern State Hospital, Central State Hospital, Telfair County Hospital, and the Georgia Department of Corrections. These records contained both medical and psychiatric information pertaining to Hulett. Trial counsel reviewed Hulett's juvenile court records, which they received from the State in

discovery. Dr. Caruso's testimony indicates that he had reviewed at least a portion of Hulett's school records, and, in the absence of evidence to the contrary, it is reasonable to presume that trial counsel obtained those records and provided them to Dr. Caruso. See State v. Worsley, 293 Ga. 315, 324 (3) (745 SE2d 617) (2013) (stating that "a silent or ambiguous record is not sufficient to overcome the presumption" that counsel performed reasonably).

All things considered, we conclude that Hulett has not demonstrated that trial counsel acted unreasonably in strategically deciding to utilize Cooper to conduct the mitigation investigation rather than to hire a mitigation specialist or that trial counsel failed to pursue leads that a reasonably trained mitigation specialist would have pursued. Absent any showing of unreasonableness, we cannot say that trial counsel rendered deficient performance by assigning Cooper the task of performing a mitigation investigation rather than retaining a mitigation specialist.

Hulett has also failed to show that he was prejudiced by the challenged conduct. While he makes some conclusory assertions regarding what results

41

hiring a mitigation specialist would have produced,[12] he presented no evidence in his motion for new trial to show exactly what additional mitigating evidence would have been revealed as the result of hiring a mitigation specialist, much less that such additional evidence in reasonable probability would have persuaded a rational trier of fact to reach a different sentencing verdict. See Wong v. Belmontes, 558 U. S. 15, 27 (II) (130 SCt 383, 175 LE2d 328) (2009) ("Strickland places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different." (citation omitted)).

(ii) Failure to Provide Dr. Caruso with Medical Records. Hulett also alleges that trial counsel were ineffective in failing to provide Dr. Caruso with "complete and pertinent" medical records,[13] and he contends that

---

[12] For instance, Hulett alleges that a mitigation specialist would have been able to compose his "bio-psycho-social history" and thus convey to the sentencer "what ha[d] happened physically, psychologically, socially to [him] throughout [his] lifetime." However, Hulett presented no evidence indicating what such a history would have looked like. Therefore, it is impossible to determine whether that evidence would have been more compelling than the lay and expert testimony and the medical records regarding Hulett's life history that were actually presented at trial and, thus, whether that evidence in reasonable probability would have led to a different outcome.

[13] A review of the record shows that Dr. Caruso was at least partly mistaken when he testified that he had not been provided with any medical records showing that Hulett "had been treated with medications commonly used for bi-polar disorder, . . . including Zyprexa, Zoloft and Depakote." The district attorney elicited testimony from Dr. Caruso on cross-examination that the records that he reviewed showed that Hulett had been treated with "a number of anti-depressants,"

Dr. Caruso could not have given "a full opinion as to [Hulett] and his mental health without the complete records." However, Hulett did not identify what medical records were not provided to Dr. Caruso, did not tender any allegedly missing medical records into evidence at the new trial hearing, and did not present any evidence regarding Dr. Caruso's expected testimony had he been supplied with additional medical records. Therefore, as "[s]peculation is insufficient to satisfy the prejudice prong of Strickland," Hulett has failed to carry his burden with respect to this claim. Cormier v. State, 277 Ga. 607, 608 (2) (a) (592 SE2d 841) (2004).

(iii) Deficiencies in Preparing and Presenting Mitigation Evidence. Finally, Hulett alleges that trial counsel were ineffective in several ways in presenting mitigating evidence in the sentencing phase of trial.

Failure to Present Certain Witnesses. First, Hulett alleges that trial counsel were ineffective in failing to locate and present at trial the mitigating testimony of the following: Hulett's "number one friend," Billy Ellison;

_____

"medications used to control problems with impulsive agitation," and Lithium and other anti-psychotic medications, and a review of the GDOC medical records reviewed by Dr. Caruso and submitted into evidence at trial specifically shows that Hulett was treated with Zyprexa and Depakote in the Spring of 2001.

Hulett's lifelong family friend, Arthur Harris; and Hulett's cousins, Darren Meeks, and Owen and Alton Hulett. Even assuming that trial counsel acted unreasonably in not locating these witnesses and presenting their testimony, a matter we do not decide, Hulett cannot prevail here because he cannot show that he was prejudiced by these omissions. Hulett failed to present Ellison's testimony at the new trial hearing and thus cannot show that he was prejudiced by the omission of this testimony. See Morgan v. State, 275 Ga. 222, 227 (10) (564 SE2d 192) (2002) (holding that counsel's alleged omission cannot be deemed prejudicial where the defendant has not shown that the omitted evidence existed, was available, and would have been favorable to his defense). Substantially all of the mitigating testimony provided by the remaining witnesses was cumulative of the testimony presented at trial that Hulett was raised by his grandparents with little supervision or parental involvement and was exposed to drug and alcohol abuse from an early age. The trial witnesses also gave a more detailed and compelling account of Hulett's background than his new witnesses because they were Hulett's own mother, father, and stepmother. Trial counsel cannot be found to be ineffective for not introducing this cumulative evidence. See Schofield v. Holsey, 281 Ga. 809, 814 (II) (642

44

SE2d 56) (2007) (holding that the petitioner was not prejudiced by the omission of "largely cumulative" evidence).

Hulett also alleges that trial counsel were ineffective in failing to interview and present as mitigation witnesses any persons from any schools that Hulett attended or any persons involved in Hulett's "long term alcohol and drug treatment." However, Hulett presented no evidence showing what such interviews would have revealed and what such witnesses' testimony would have been. Thus, he has failed to demonstrate a reasonable probability that the additional interviews or testimony would have altered the outcome of the trial in his favor. "[Hulett]'s rank speculation that they would have made a difference is insufficient as a matter of law to establish Strickland prejudice." Peterson v. State, 284 Ga. 275, 277 (663 SE2d 164) (2008). See Morgan, 275 Ga. at 227.

Failure to Prepare the Lay Witnesses. Hulett also alleges that trial counsel were ineffective in preparing the lay mitigation witnesses to testify. In support of this claim, he presented the testimony of his father and stepmother that the defense investigator spoke to them approximately a month before trial and that trial counsel did not speak to them until they came to Walker County for the

45

trial. However, this evidence is insufficient to overcome the presumption that trial counsel's preparation was reasonable, particularly given Moore's testimony that he and Hill spoke with Hulett's parents about their testimony before trial and that he considered their testimony to be the most effective way of presenting Hulett's background, which indicates that trial counsel were familiar with the witnesses' testimony before trial. Moreover, even assuming that trial counsel were ineffective in preparing these witnesses, Hulett has failed to show prejudice. The testimony of his father and stepmother that Hulett presented in support of this claim at the new trial hearing that he had "a rough life," that his father was not an "ideal parent" and drank and smoked marijuana in front of him, that his mother abandoned him, and that he was taken to psychiatrists and had a history of inhaling gasoline is cumulative of their testimony at trial. See Holsey, 281 Ga. at 814 (holding that the petitioner was not prejudiced by the omission of "largely cumulative" evidence). Compare Turpin v. Christenson, 269 Ga. 226, 237-238 (12) (B) (497 SE2d 216) (1998) (finding ineffective assistance where mitigation witnesses were not adequately prepared for the DA's cross-examination and where their testimony was contradicted by a key defense exhibit).

Failure to Ask About Mercy. Hulett also alleges that trial counsel were ineffective in not asking the lay witnesses at trial their opinions about whether the trial court should extend mercy to him. At the new trial hearing, trial counsel could not recall why they did not ask any lay witnesses about mercy but pointed out that Hulett did not want mercy. On reviewing the lay witnesses' testimony presented at the new trial hearing, we conclude that Hulett cannot show that he was prejudiced by trial counsel's failure to make this inquiry of the mitigation witnesses. Several of the reasons that the witnesses gave for being in favor of mercy were not particularly persuasive, because they were not specific to Hulett but, instead, were generic statements that "everyone" deserved to live or statements expressing a general opposition to the death penalty. One witness pointedly avoided the question as to whether it would benefit his life for Hulett to receive mercy and subsequently testified that he did not communicate with Hulett, although he was "sure" that Hulett's father did. We are not persuaded that a reasonable sentencer would have found such testimony compelling. Furthermore, inquiring about mercy at the new trial hearing led the district attorney to cross-examine Hulett's stepmother regarding whether she was aware of any remorse on Hulett's part for committing the murders, and she

admitted that, to her knowledge, Hulett had never expressed remorse for the victims' deaths, testimony that a reasonable sentencer was more likely to find aggravating than mitigating.

Most significantly, a review of the trial testimony shows that counsel elicited from the lay witnesses substantial information regarding Hulett's life that might encourage a reasonable sentencer to consider mercy. Then, in the sentencing phase closing argument, Hill drew the trial court's attention to that information by first arguing that, while the victims' deaths were certainly a tragedy, Hulett's life was also a tragedy. Hill then summarized the family members' testimony about Hulett's childhood, including that from an early age he witnessed drug and alcohol abuse and violence between his parents and that he had had to fend for himself to the extent that he knew how to open his own cans of food as a toddler. Hill reminded the trial court that Hulett's mother had abandoned him when he was a baby, that his father simply did not know how to raise him, that the grandparents who had raised him had been alcohol abusers, and that Dr. Caruso had testified that he had "severe" mental problems. Hill explained that he was not asking the trial court to excuse Hulett but, instead, "to have mercy on this young man." Then Hill read a portion of the handwritten

48

note that had been found in Larry Phelps' truck in which Hulett expressed both his belief that no one cared about him and his remorse "for what [he had] done." Hill contended that the trial court had "a chance to send a message to Mr. Hulett [that] somebody does care" by "hav[ing] mercy on [his] soul" and sentencing him to life without parole, and he reminded the trial court that Dr. Caruso had testified that with proper medication Hulett would do well in a controlled prison environment. We cannot say that there is a reasonable probability that the little additional testimony on the subject of mercy in sentencing that was presented at the new trial hearing would have changed the outcome of the sentencing phase.

(iv) Combined Effect of Trial Counsel's Alleged Deficiencies. We conclude that the combined effects of these several alleged attorney errors are insufficient to establish the prejudice required by Strickland in order to establish ineffective assistance of trial counsel. See Holsey, 281 Ga. at 811-812 n. 1 (holding that the combined effect of trial counsel's deficiencies should be considered). With respect to many of Hulett's allegations, we have affirmed the trial court's findings and conclusions that Hulett failed to carry the burden of establishing that trial counsel's performance was constitutionally deficient.

49

Even assuming trial counsel error with respect to the other grounds for Hulett's assertion of ineffective assistance of counsel, as we have for the sake of analysis, and considering the mitigating evidence that was presented at his new trial hearing along with the mitigating evidence presented at trial, we still conclude that the new mitigating evidence would not in reasonable probability have resulted in a different sentencing verdict for Hulett for the commission of the Phelps brothers' brutal murders.  See Sears v. Humphrey, 294 Ga. 117, 131 (II) (D) (751 SE2d 365) (2013) (explaining that, in determining Strickland prejudice in a case challenging a death sentence, "this Court must consider the totality of the available mitigating evidence in reweighing it against the evidence in aggravation, while being mindful that a verdict or conclusion with overwhelming record support is less likely to have been affected by errors than one that is only weakly supported by the record").

Post-Trial Delay of Execution

6.  Hulett contends that his eventual execution after having experienced a delay of approximately nine years between his trial and direct appeal would violate the Eighth Amendment's proscription against cruel and unusual punishment.  While this Court has never addressed a claim exactly like the one

50

that Hulett makes, we have previously rejected similar arguments alleging an excessive delay between sentencing and execution in two cases where death row inmates' appeals had resulted in resentencing trials. See Jones v. State, 273 Ga. 231, 233 (2) (539 SE2d 154) (2000) (finding meritless a "'waiting for execution is intolerably cruel' argument"); Potts v. State, 259 Ga. 96, 105 (35) (376 SE2d 851) (1989) (same).

Moreover, while recognizing that "[t]he denial of a writ of certiorari imports no expression of opinion upon the merits of the case," United States v. Carver, 260 U. S. 482, 490 (43 SCt 181, 67 LEd 361) (1923), we note that the Supreme Court of the United States has both recently and repeatedly denied petitions for writs of certiorari involving similar Eighth Amendment challenges to the imposition of the death penalty in cases where the inmates had been on death row for periods significantly longer than a decade. See, e.g., Johnson v. Bredesen, 558 U. S. 1067 (130 SCt 541, 175 LE2d 552) (2009) (nearly 29 years); Thompson v. McNeil, 556 U. S. 1114 (129 SCt 1299, 173 LE2d 693) (2009) (32 years); Knight v. Florida, 528 U. S. 990 (120 SCt 459, 145 LE2d 370) (1999) (19 and nearly 25 years); Elledge v. Florida, 525 U. S. 944 (119 SCt 366, 142 LE2d 303) (1998) (23 years); Lackey v. Texas, 514 U. S. 1045 (115

51

SCt 1421, 131 LE2d 304) (1995) (17 years).  Furthermore, federal courts of appeal, including the Eleventh Circuit, have held that prolonged incarceration under a sentence of death does not violate the Eighth Amendment.  See, e.g., Thompson v. Secretary for Dept. of Corr., 517 F3d 1279, 1284 (II) (11th Cir. 2008) (noting "the total absence of Supreme Court precedent that a prolonged stay on death row violates the Eighth Amendment guarantee against cruel and unusual punishment" and "conclud[ing] that execution following a 31-year term of imprisonment is not in itself a constitutional violation").  But cf. Jones v. Chappell, No. CV 09-02158-CJC, 2014 WL 3567365, at *1, *14 (C.D. Cal. July 16, 2014) (holding that California's "dysfunctional" death penalty system, in which only 13 of over 900 individuals sentenced to death since 1978 have been executed, violates the Eighth Amendment because it is "arbitrary" and "serves no penological purpose" and therefore vacating the death sentence of an inmate on death row for 19 years).  As Hulett presents no authority or new argument that persuades us to hold otherwise under the circumstances of his case, we deny this claim.[14]  See People v. Ochoa, 28 P3d 78, 114-115 (II) (B) (11) (Cal. 2001)

---

[14] In denying Hulett's claim, the trial court found that "the delay in holding [the new trial] hearing must be attributed solely to [Hulett]."  Although Hulett disputes this finding, it is supported in the record, which shows that Hulett failed to file any requests for a hearing in the almost nine

(rejecting a defendant's contention that the nine-year delay between his sentencing and appeal resulted in cruel and unusual punishment), abrogated on other grounds as stated in People v. Prieto, 66 P3d 1123, 1147 n. 14 (Cal. 2003).

years between the filing of his motion for new trial and the actual hearing, while the State appears to have made at least one attempt to move Hulett's motion for new trial forward. See Shank v. State, 290 Ga. 844, 849 (5) (c) (725 SE2d 246) (2012) (stating that all of those involved in the criminal justice system, including "defense counsel and defendants," have a duty "to ensure that the appropriate post-conviction motions are filed, litigated, and decided without unnecessary delay"). Furthermore, at the November 3, 2011, hearing set by the trial court, the court questioned Hulett's counsel about the extraordinary delay in moving forward with the motion for new trial. Hulett's lead counsel stated that the delay was the result of direction "from [his] client" and that "it was directed as trial tactic," and co-counsel agreed. Although Hulett did not claim a violation of his constitutional due process right to a speedy appeal, the trial court stated in its order that Hulett failed to show that he had been prejudiced "by the delay he ha[d] orchestrated," citing Barker v. Wingo, 407 U. S. 514 (92 SCt 2182, 33 LE2d 101) (1972). See Chatman v. Mancill, 280 Ga. 253, 256-260 (2) (a) - (e) (626 SE2d 102) (2006) (determining that constitutional speedy appeal claims in criminal cases in which a death sentence was not imposed should be evaluated by application of the following "modified Barker factors": length of the delay, reason for the delay, defendant's assertion of his right, and prejudice, i.e, whether there was a reasonable probability that, but for the delay, the result of the appeal would have been different). This Court has never addressed how to resolve constitutional speedy appeal claims in cases in which a death sentence was imposed. But see Weis v. State, 287 Ga. 46, 48 (1) (694 SE2d 350) (2010) (evaluating a defendant's constitutional speedy trial claim in a death penalty case under the Barker test). See also Allen v. State, 686 NE2d 760, 782-783 (IV) (B) (Ind. 1997) (assessing a constitutional speedy appeal claim in a death penalty case under a "slightly modified version" of the Barker test and noting that the majority of federal circuits that have addressed this issue have also utilized the Barker test). At any rate, we note that "[Hulett] 'provides no evidence of prejudice arising from the delay' and 'does not advance any argument that the appeal he now pursues has been hampered by the delay in any way.'" (Citation omitted.) Glover v. State, 291 Ga. 152, 155 (3) (728 SE2d 221) (2012) (applying the modified Barker factors and holding that a ten-year delay in conducting the new trial hearing in a non-death penalty malice murder prosecution did not violate the defendant's due process rights, where the defendant provided no evidence of prejudice arising from the delay).

Sentence Review

7. The sentencing phase evidence showed the following. At age 14, Hulett burglarized a hardware store and stole several guns after running away from a youth rehabilitation home. In 2001, while serving a prison sentence based on his conviction for felony theft by taking of an automobile, he escaped from a state prison facility in a state vehicle, abandoned that vehicle, stole another vehicle from a dealership, and was attempting to steal a third vehicle when he was apprehended. He was released from prison on June 17, 2002, after signing a form acknowledging that he was required to report to the Gordon County Probation Office in Calhoun after his release. He then moved in with his mother and her fiancé in Tifton. On July 9, 2002, his mother's fiancé took him to the bus station, where he purchased Hulett a ticket and "put him on a bus" to Calhoun so that he could report to his probation officer. However, Hulett never reported to his probation officer, and, on July 17, 2002, his probation officer applied for a warrant for his arrest. Approximately three days later and roughly thirty-six hours before the murders, he disappeared with the Chevrolet Cavalier that he stole from a new acquaintance. The State also presented evidence that Hulett had committed numerous infractions while

54

incarcerated awaiting trial, including breaking two cell door windows, cursing at guards and refusing to comply with their commands, and physically attacking another inmate. See Gissendaner v. State, 272 Ga. 704, 717 (19) (a) (532 SE2d 677 (2000) (stating that OCGA § 17-10-35 (c) (3), which directs this Court to consider the defendant in its sentence review, "requires a review of the aggravating factors presented at trial, including both past conduct and conduct after the crime").

(a) The trial court sentenced Hulett to death for Larry Phelps' murder based on the following statutory aggravating circumstances, which it found to exist beyond a reasonable doubt: the murder was committed while Hulett was engaged in the commission of other capital felonies, to wit: the murder and the armed robbery of Arvine Phelps; the murder was committed for the purpose of receiving money or any other thing of monetary value; and the murder was committed for the purpose of avoiding Hulett's lawful arrest. See OCGA § 17-10-30 (b) (2), (4), (10). The trial court sentenced Hulett to death for Arvine Phelps' murder based on the following statutory aggravating circumstances, which it found existed beyond a reasonable doubt: the murder was committed while Hulett was engaged in the commission of another capital

55

felony, to wit: the armed robbery of Larry Phelps; the murder was committed for the purpose of receiving money or any other thing of monetary value; the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim; and the murder was committed for the purpose of avoiding Hulett's lawful arrest. See id. at (b) (2), (4), (7), (10).

This Court is required to review each statutory aggravating circumstance and to determine if it is supported by the evidence. See OCGA § 17-10-35 (c) (2). Viewed in the light most favorable to the verdict, we conclude that the evidence presented in both phases of trial as summarized in this division and in Division 1 was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt the existence of the statutory aggravating circumstances as to each victim in this case.[15] See O'Kelley v. State, 284 Ga. 758, 766 (3) (670

---

[15] The trial court's finding of the (b) (7) statutory aggravating circumstance as to Arvine Phelps' murder referred to "torture, depravity of mind, or an aggravated battery to the victim." (Emphasis supplied.) In previous cases in which a jury has returned a verdict finding the (b) (7) circumstance in the disjunctive, we have set the (b) (7) circumstance aside because it could not be determined "whether the jury agreed unanimously on any one of the three subparts." Ellington v. State, 292 Ga. 109, 146 (13) (735 SE2d 736) (2012). See, e.g., Rivera v. State, 282 Ga. 355, 366 (14) (647 SE2d 70) (2007). In this case, however, the trial court, not a jury, determined Hulett's sentence. Therefore, unanimity concerning at least one of the subparts is assured. Furthermore, the evidence authorized a rational trier of fact to conclude that Arvine Phelps lay alive and bleeding profusely from his gunshot wounds for a sufficient time period that his brother was able to remove his shirt and attempt to render him aid and that Arvine Phelps was still alive but lying helpless on

SE2d 388) (2008) ("The jury may consider evidence from the guilt/innocence phase when determining the appropriate sentence."). See also Ring v. Arizona, 536 U. S. 584 (122 SCt 2428, 153 LE2d 556) (2002); Jackson, 443 U. S. at 318-319; OCGA § 17-10-35 (c) (2). However, we believe that our conclusion that there was sufficient evidence for a rational trier of fact to find beyond a reasonable doubt the (b) (10) statutory aggravating circumstance as to each victim warrants further discussion.

OCGA § 17-10-30 (b) (10) and (c) provide that the death penalty may be imposed where the evidence authorizes a rational trier of fact to find beyond a reasonable doubt that the defendant committed the murder "for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another." We have previously noted that

> our cases to date have upheld the (b) (10) circumstance only where
> the evidence supported a finding that the defendant was, at the time

---

the ground when Hulett shot his brother and then crushed Arvine's skull. Thus, there was sufficient evidence to support a finding of any one of the three subparts of the (b) (7) circumstance. See Hance v. State, 245 Ga. 856, 860-863 (3) (268 SE2d 339) (1980) (defining what evidence is sufficient to satisfy the various subparts of the (b) (7) circumstance); OCGA § 17-10-35 (c) (2). Although we need not set aside this statutory aggravating circumstance in Hulett's case, we remind trial courts to separate the applicable subparts of the (b) (7) circumstance on the verdict form to require a finding by the factfinder as to the individual subparts. That procedure allows this Court to determine what subparts the fact finder unanimously found beyond a reasonable doubt and thereby avoids the situation in which we are required to set aside this statutory aggravating circumstance due to a legally deficient verdict.

of the murder, in <u>immediate</u> peril of being lawfully arrested, placed in custody, or confined in a place of lawful confinement by a law enforcement officer.

(Emphasis supplied.) <u>Humphreys v. State</u>, 287 Ga. 63, 84 (10) (694 SE2d 316) (2010) (listing cases). While a defendant's motive can be more readily inferred from the evidence in such cases, we have explained that "th[is] Code section is not limited to that situation." Id.

The evidence presented at Hulett's trial showed the following: at the time of the murders, Hulett was a convicted felon and had failed to report to his probation officer, despite having been put on a bus to Calhoun for that purpose, having been in the area for well over a week, and having been within three miles of the probation office on multiple occasions; after having attempted to contact Hulett multiple times, his probation officer had applied for a warrant for his arrest for his failure to report; and, after stealing two guns, ammunition, and the Cavalier, Hulett left Calhoun on the day before the murders. A rational trier of fact was authorized to conclude from this evidence that Hulett had no intention of complying with his terms of probation. The evidence further showed that Hulett was left stranded overnight on a rural roadway when the stolen Cavalier became disabled and that, after shooting the Phelps brothers, he took their truck,

left the area immediately, and subsequently left Georgia. Based on this evidence, the State contended at trial that Hulett, who feared that he would be discovered sitting on the side of the road in a stolen car, took the stolen guns and spent the night off the roadway and that, after hearing the Phelps brothers' chainsaws the following morning, discovered the brothers "busy cutting trees" and their truck parked nearby. The State then argued that Hulett climbed "up the mountain" and shot the two men below so that he could take their truck, leave the area, and thus avoid his arrest for violating probation and stealing the Cavalier. We conclude that the evidence was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Hulett's motive in murdering the Phelps brothers was to avoid his own lawful arrest. Compare Humphreys, 287 Ga. at 83-84 (finding the evidence insufficient to support the (b) (10) circumstance where it showed only that the defendant murdered the victims after robbing them and the State argued that the defendant's purpose for the murders was the prevention of his apprehension for the robberies).

(b) Upon a review of the trial record, we conclude that Hulett's death sentences were not imposed under the influence of passion, prejudice, or any other arbitrary factor. See OCGA § 17-10-35 (c) (1).

59

(c) Considering both the murders in this case and Hulett as a defendant, we find that the death sentences imposed were not disproportionate punishment within the meaning of Georgia law. See OCGA § 17-10-35 (c) (3); Barrett, 292 Ga. at 190 (explaining that this Court is required to determine whether the defendant's death sentence is excessive per se or substantially out of line in comparison to the sentences imposed in similar cases upon similarly situated defendants but is not required to find identical cases for comparison in its proportionality review). The cases cited in the Appendix support this conclusion because each of them shows the willingness of juries in Georgia to impose the death penalty in cases involving evidence that the defendant murdered multiple persons, whether in one or more than one transaction. See OCGA § 17-10-35 (e).

Judgment of conviction affirmed in part and vacated in part, death sentences affirmed, and case remanded for resentencing. All the Justices concur.

# APPENDIX

Tate v. State, 287 Ga. 364 (695 SE2d 591) (2010); Humphreys v. State, 287 Ga. 63 (694 SE2d 316) (2010); Stinski v. State, 286 Ga. 839 (691 SE2d 854) (2010); O'Kelley v. State, 284 Ga. 758 (670 SE2d 388) (2008); Rivera v. State, 282 Ga. 355 (647 SE2d 70) (2007); Williams v. State, 281 Ga. 87 (635 SE2d 146) (2006); Lewis v. State, 279 Ga. 756 (620 SE2d 778) (2005); Riley v. State, 278 Ga. 677 (604 SE2d 488) (2004); Franks v. State, 278 Ga. 246 (599 SE2d 134) (2004); Sealey v. State, 277 Ga. 617 (593 SE2d 335) (2004); Raheem v. State, 275 Ga. 87 (560 SE2d 680) (2002), disapproved on unrelated grounds by Patel v. State, 282 Ga. 412, 413 n. 2 (651 SE2d 55) (2007); Lance v. State, 275 Ga. 11 (560 SE2d 663) (2002); Lucas v. State, 274 Ga. 640 (555 SE2d 440) (2001); Rhode v. State, 274 Ga. 377 (552 SE2d 855) (2001); Colwell v. State, 273 Ga. 634 (544 SE2d 120) (2001); Heidler v. State, 273 Ga. 54 (537 SE2d 44) (2000); Morrow v. State, 272 Ga. 691 (532 SE2d 78) (2000); Pace v. State, 271 Ga. 829 (524 SE2d 490) (1999); Cook v. State, 270 Ga. 820 (514 SE2d 657) (1999); DeYoung v. State, 268 Ga. 780 (493 SE2d 157) (1997); Raulerson v. State, 268 Ga. 623 (491 SE2d 791) (1997); Bishop v. State, 268 Ga. 286 (486 SE2d 887) (1997); McMichen v. State, 265 Ga. 598 (458 SE2d 833) (1995).