In the Supreme Court of Georgia

Decided:   February 1, 2016

S15A1705.  SMITH v. THE STATE.

NAHMIAS, Justice.

Appellant Christopher Anton Smith challenges his convictions for malice murder and other crimes in connection with an armed robbery during which Russell Roland was fatally shot and Victor Powell was injured.  Appellant contends that his right to be present during trial was violated when the court removed a prospective juror from the venire when Appellant was not in the courtroom and that his trial counsel provided ineffective assistance in several ways.  We reject these contentions and affirm Appellant's convictions, but we vacate the trial court's judgment in part and remand the case for correction of sentencing errors that we have identified.[1]

---

[1]  The crimes occurred on December 29, 2007.  Appellant's first trial in November 2010 ended with a hung jury.  On January 7, 2011, Appellant was re-indicted on charges of malice murder, three counts of felony murder, armed robbery, two counts of aggravated assault, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a crime.  At his second trial from January 19 to 24, 2011, the jury found Appellant guilty of all charges.  The trial court sentenced him to serve life in prison for malice murder, 20 consecutive years for the aggravated assault of Powell, and five more years for possession of a firearm during the commission of a felony.

1.     Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. On December 29, 2007, at around 4:00 a.m., Victor Powell was walking home from a friend's place in southeast Atlanta when he passed by the house of a man he knew as "Quan," who had hired Powell to do work on the house. Powell saw lights on inside and decided to stop by to see if Quan would pay him for the work that he had completed. Russell Roland, a drug dealer who had been staying at Quan's house, answered the door and let Powell in. Quan and his girlfriend were out at a club, and Powell decided to wait with Roland until Quan returned home.

Powell saw a black car pull into the driveway and a man walking to the door. The man knocked and identified himself as "Lil' Chris from College Park." Roland said that he knew the man, so Powell opened the door and let him in. Chris said that he and some friends had a flat-screen television that they wanted to sell, and Roland agreed to buy the TV with cash and cocaine. Chris

The felony murder counts were vacated by operation of law, and the trial court merged the remaining three counts for sentencing (which was error as to two of those counts, as explained in Division 4 below). On February 1, 2011, Appellant filed a motion for new trial, which he amended with new counsel on September 16 and October 1, 2013. After an evidentiary hearing, the trial court denied the motion on April 15, 2014. Appellant filed a motion for out-of-time appeal on August 28, 2014, which was granted on September 5, 2014. Appellant then filed a timely notice of appeal, and the case was docketed in this Court for the September 2015 term and orally argued on October 20, 2015.

went back outside and then returned with two other men. At this point, Quan's girlfriend, Shawnell Johnson, returned from the club in a cab and came inside the house to retrieve her wallet and car keys. The cab driver also came in and bought $150 worth of cocaine from Roland. Roland put the $150 in his pocket, where he already had several thousand dollars in cash.

After Johnson left with the cab driver, one of the men who had entered the house with Chris shot Powell in the leg, put a gun to his head, and told him not to move, while Chris and his other associate pulled out guns and demanded money and drugs from Roland. Roland gave Chris the money in his pocket and directed him to a cigar box where he kept his drugs, which Chris also took. The three assailants then shot Roland multiple times before fleeing. Johnson and the cab driver heard gunshots as they drove away. Roland died at the scene; Powell survived.

The day after the incident, the police interviewed Powell, who gave descriptions of the three assailants. Powell described the man who first came into the house – Chris – as having a tattoo on his neck and a mole or mark on his face; Appellant – Christopher Smith – has such a tattoo and mark. Powell also said that he had seen a black Monte Carlo or Camry and a red car outside of the

3

house. Johnson identified Appellant in a photographic lineup and at trial as one of the men she saw in the house with Roland and Powell. Atlanta Police Detective Nicole Redlinger testified that Appellant was known as "Little Chris," lived in College Park, and drove a black Monte Carlo. A drug scale with suspected cocaine residue and a small amount of marijuana were found in Appellant's residence at the time of his arrest.[2]

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

---

[2] The record does not indicate if the other two assailants were ever identified or arrested.

2.     Appellant contends that his constitutional right to be present at trial was violated because a portion of the proceeding – the removal of a prospective juror – occurred when he was not in the courtroom.  During general voir dire on the first morning of the trial, Juror #33 raised her hand in response to a question about whether anyone in the venire had experienced something that would prevent him or her from being impartial.  After most of the jury pool was excused for a lunch break, Juror #33 and several other prospective jurors, most of whom had noted potential hardships if required to serve, were questioned individually.  With Appellant present, one of the jurors (#25) was questioned, expressed his inability to be impartial because he and his family had been the victims of violent crimes, and was removed from the venire by the trial court for cause on motion by Appellant's counsel.  Another juror (#28) was also questioned due to concerns about impartiality, but was not removed.

A few minutes later, with Appellant still present, Juror #33 was brought in to the courtroom.  In response to questioning by the court and counsel for both parties, she explained that she could not be fair and impartial in this case because her grandmother had been shot and permanently injured in an armed robbery.  Immediately after Juror #33 left the courtroom, Appellant's counsel

5

said that Appellant urgently needed to use the restroom, and the court gave its permission. After Appellant left the courtroom, the prosecutor asked Appellant's counsel if he had a motion. Appellant's counsel said that he did and that he could make it when Appellant got back from the restroom. The prosecutor said, "okay." The court then asked, "Are you going to want to be heard on 33?" and the prosecutor replied, "No." The court said, "All right. I am going to remove 33 without objection. You need to do it again when your client is here. . . . I want a perfect record." Appellant then returned from the restroom, and the court said, "All right. Let's have our next juror in, please. Let's hurry it up, 39, then 40." Perhaps due to the hurry, no motion to strike Juror #33 was repeated in Appellant's presence.

> The United States Supreme Court has long recognized that a criminal defendant's right to be present at all critical stages of the proceedings against him is a fundamental right and a foundational aspect of due process of law. This Court's interpretation of the analogous provisions of the Georgia Constitution has always been in accord.

Hampton v. State, 282 Ga. 490, 492 (651 SE2d 698) (2007) (footnotes omitted). As both parties recognize, under this doctrine, Appellant had the right to be present during the discussion that led to Juror #33's removal for cause. See

Zamora v. State, 291 Ga. 512, 517-518 (731 SE2d 658) (2012) (reiterating that "'[p]roceedings at which the jury composition is selected or changed are . . . critical stage[s] at which the defendant is entitled to be present.'" (citation omitted)). However,

> the right to be present belongs to the defendant and the defendant is free to relinquish that right if he or she so chooses. "The right is waived if the defendant personally waives it in court; if counsel waives it at the defendant's express direction; if counsel waives it in open court while the defendant is present; or if counsel waives it and the defendant subsequently acquiesces in the waiver."

Ward v. State, 288 Ga. 641, 646 (706 SE2d 430) (2011) (citation omitted).

In this case, it is clear that Appellant did not personally waive in court his right to be present for the discussion of Juror #33's removal, and his counsel did not waive Appellant's right to be present at his express direction or in his presence.[3] However, the record shows that Appellant acquiesced in the removal of Juror #33 in his absence. "Acquiescence means a tacit consent to acts or conditions, and implies a knowledge of those things which are acquiesced in." Id. at 646 (citations and quotation marks omitted). And while Appellant was not

_____

[3] The State asserts that Appellant likely discussed the removal of Juror #33 with his counsel, but the record contains no evidence of such a discussion. Indeed, neither the State nor Appellant questioned his trial counsel about this issue at the motion for new trial hearing (and Appellant did not testify).

7

present during the brief period when the trial court and lawyers discussed removing Juror #33 and when the court actually struck the juror for cause, he was present in the courtroom on *four* later occasions when Juror #33's removal by the court was expressly noted – yet Appellant raised no question or concern about her removal.

To begin with, Appellant knew about the process by which prospective jurors could be removed by the court due to an expressed lack of impartiality, as the court had removed another juror for a very similar reason, on Appellant's counsel's motion and  in Appellant's presence, just minutes before Juror #33 was questioned.  Appellant was also present for the entirety of the individual voir dire where Juror #33 clearly articulated why she could not be impartial, so he knew the actual reason for her removal.  Compare Zamora, 291 Ga. at 519 (noting that the defendant was unaware at trial of the reasons for removal of the juror in question, which were discussed only in bench conferences that he could not hear).  And Appellant obviously knew that Juror #33 had been removed, as she did not sit on the jury that was selected the next day to decide his case and proceeded to do so for the next several days.  See id.  (noting that the defendant could presumably see the removed trial juror turn in his badge and leave the

8

courtroom during the final bench conference). Indeed, the record indicates that the prospective jurors who had been removed during the individual questioning discussed above did not return to the courtroom after the lunch break, so Juror #33 would not have been present for the remainder of the jury selection process.

Most important, the fact that Juror #33 had been removed from the jury pool as a result of the interchange between counsel and the court was discussed in Appellant's presence four separate times between his bathroom break and the final selection of the trial jury the next day. First, right after the lunch break, the court and counsel reviewed which prospective jurors had already been removed; Appellant's counsel specifically listed Juror #33 and the court confirmed that. Second, after the remaining jurors reentered the courtroom, the court told them (and Appellant) that Juror #33 was one of the jurors whom "we have questioned . . . individually and excused . . . on threshold issues." Third, a few minutes later, before allowing the remaining jurors to leave for the day, the court again went through the list of jurors who had already been removed, specifically mentioning Juror #33, and adding a few more jurors whom the court removed for hardship. Finally, after the completion of voir dire the next morning and before the parties selected the jury, the court, Appellant's counsel, and the

9

prosecutor, after considerable additional discussion and argument regarding striking jurors for cause or hardship, went through the list of removed jurors and once again confirmed that Juror #33 had been removed. Once the 12 trial jurors and an alternate were selected and seated in the jury box – without Juror #33 – Appellant's counsel was asked by the court, "Is this the jury you selected?" He answered "Yes." Appellant was present for each of these discussions, but there is no indication in the record that he ever raised a question or voiced an objection to his counsel or the trial court at any point during the trial regarding Juror #33's removal. The first time that Appellant contended that his right to be present was violated was in his amended motion for new trial, which was filed over two years after the trial.[4]

Under these circumstances, we conclude that Appellant acquiesced in the limited trial proceeding that occurred in his absence. See Zamora, 291 Ga. at 520 (holding that the defendant acquiesced in the dismissal of a trial juror at a

---

[4] In this respect, it is worth noting that while our precedents would not require Appellant to show actual prejudice had he properly asserted his right to be present during Juror #33's removal, he has not suggested, even on appeal, any way in which his presence during the discussion of her removal would have changed the outcome of his trial, nor has he ever suggested why he would have wanted Juror #33, who clearly expressed her partiality against his case, to serve on his jury. See Zamora, 291 Ga. at 520 n.4.

bench conference that occurred in his absence, where he did not voice any objection until his appeal brief). See also Jackson v. State, 278 Ga. 235, 237 (599 SE2d 129) (2004) (holding that the appellants "acquiesced in the proceedings [occurring in their absence] when their counsel made no objection and appellants thereafter remained silent after the subject was brought to their attention"); Hanifa v. State, 269 Ga. 797, 807 (505 SE2d 731) (1998) (finding acquiescence where the defendant failed to object after learning prior to the return of the jury's verdicts that the court had spoken with the jury outside of the his presence).[5]

3.      Appellant contends that he received ineffective assistance from his trial counsel due to two differences in his first and second trials and due to counsel's failure at the second trial to correct or object to certain testimony by

_____

[5] Compare Ward, 288 Ga. at 646 (holding that because the defendants were not informed of a trial juror's removal outside their presence or the reason for the removal, they could not knowingly acquiesce to the waiver by their attorneys); Sammons v. State, 279 Ga. 386, 388 (612 SE2d 785) (2005) (holding that the defendant, who learned during trial that a juror had been replaced outside her presence, but not the reason for the juror's removal, and told her counsel – who failed to take any action – that she did not want the juror replaced, did not "acquiesce in the illegal proceedings in her absence and repudiated trial counsel's apparent silent waiver of her rights at the first opportunity"); Pennie v. State, 271 Ga. 419, 423 (520 SE2d 448) (1999) (holding that where the defendant only learned after trial about a discussion in chambers in her absence regarding the potential removal of a juror who was left on the jury, there was no acquiescence, because she raised the issue at the first opportunity on motion for new trial).

11

Detective Redlinger.

(a) To establish that his trial counsel was constitutionally ineffective, Appellant was required to prove both deficient performance by counsel and resulting prejudice. See Strickland v. Washington, 466 U.S. 668, 687, 694 (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance, Appellant had to demonstrate that counsel performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-688. Because "[j]udicial scrutiny of counsel's performance must be highly deferential," the law recognizes a "strong presumption" that counsel performed reasonably, and the defendant bears the burden of overcoming this presumption. See id. at 689. Accord Humphrey v. Nance, 293 Ga. 189, 191-192 (744 SE2d 706) (2013). To carry this burden, Appellant must show that no reasonable lawyer would have done what his counsel did, or failed to do what his counsel did not do. See Nance, 293 Ga. at 192. In particular, "decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." Reed v. State, 294 Ga. 877, 882 (757 SE2d 84) (2014).

Even if a defendant can prove that his counsel's performance was deficient, he must also prove prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding." Harrington v. Richter, 562 U.S. 86, 104 (131 SCt 770, 178 LE2d 624) (2011) (citation and punctuation omitted). Rather, the defendant must demonstrate a "reasonable probability" of a different result, which, the United States Supreme Court has explained, is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

In all, the burden of proving a denial of effective assistance of counsel is a heavy one. See Humphrey v. Walker, 294 Ga. 855, 860 (757 SE2d 68) (2014). Appellant has not met that burden.

(b) Appellant's initial claims deal with two differences in the ways that his first and second trials unfolded. First, Appellant contends that his trial counsel, who represented him in both trials, performed deficiently in failing to properly cross-examine Shawnell Johnson as to her identification of Appellant. Appellant notes that in the first trial, when Johnson was asked why

13

she identified Appellant's picture in a photographic lineup, she said, "I remembered what I thought at the time was a scar or . . . a tattoo. That's all I remembered on the photograph." Similarly, when asked how she recognized Appellant after identifying him in court, Johnson answered, "From the scar that I seen on the man's face in the house." In the second trial, Johnson testified that she identified Appellant in the photographic lineup because she "recognized the face as the person that [she] remembered being in the home" and that she "just recognized him right off." Appellant maintains that his counsel performed deficiently in the second trial by failing to press Johnson on how she recognized Appellant, which he asserts would have revealed that Johnson's identification was not based on recognizing his face.

Appellant, however, reads too much into the quoted snippets from Johnson's testimony at the first trial. Johnson never said that she did not recognize Appellant's face generally, only that she focused on the scar or tattoo on his face. If Appellant's counsel had pressed Johnson at the second trial to elaborate on the basis for her identification of Appellant, her answer might have hurt Appellant rather than helping him as he speculates; we note that Appellant did not call Johnson to testify at the motion for new trial hearing to pursue the

14

line of questioning that he asserts would have helped him. Appellant's trial counsel sought to impeach Johnson's identification testimony at the second trial in another way, by questioning her ability to remember various details about the three men she saw inside the house on the night of the shooting. The scope and content of cross-examination are grounded in trial tactics and strategy and thus will rarely constitute deficient performance, see Cooper v. State, 281 Ga. 760, 762 (642 SE2d 817) (2007), and we cannot say that trial counsel's approach was patently unreasonable. See Reed, 294 Ga. at 882.

Second, Appellant claims that his trial counsel performed deficiently in not asking Johnson in the second trial whether she recognized Detective Redlinger in order to show Johnson's alleged "demonstrated inability to identify people." This claim rests on Johnson's testimony in the first trial that she could not identify Detective Redlinger in court or remember what the detective looked like, because she had not seen Detective Redlinger since she gave her written statement to the detective three years earlier. But Johnson's inability to recognize Detective Redlinger years after giving the detective a statement had little bearing on her specific identification of Appellant in the photographic lineup a few days after seeing Appellant in her boyfriend's house just before the

15

shooting there, and it does not demonstrate that Johnson was generally unable to identify people. Appellant again failed to show that his counsel's decision not to cross-examine Johnson on this point at the second trial was patently unreasonable. See id. Moreover, Johnson did not testify at the motion for new trial hearing, so Appellant did not establish whether she would have been able to identify Detective Redlinger if asked at the second trial. Appellant therefore failed to prove either deficiency or prejudice on this claim.

(c) Appellant claims that his counsel provided ineffective assistance at his second trial in other respects. First, Victor Powell testified at the second trial that he identified Appellant in a photographic lineup as one of the men present when he and Roland were shot, although it is undisputed that Powell did not in fact identify Appellant in a photographic lineup. Appellant claims that Detective Redlinger's testimony erroneously implied that the reason that Powell failed to pick out Appellant was because Appellant's picture was not included in the lineup that Powell was shown, and that his counsel's failure to correct this misleading testimony was deficient performance. Appellant contends that as a result, the fact that Powell was shown a lineup that included Appellant's picture but failed to pick him out was unknown to the jury.

16

This claim rests on an inaccurate premise. The prosecutor established on direct examination of Detective Redlinger that Powell was shown "a few different lineups on a few different occasions," at least one of which contained a picture of Appellant, and that Powell did not pick out Appellant as one of the men present when Powell and Roland were shot. Appellant's counsel then asked Detective Redlinger on cross-examination about one of the lineups she had shown to Powell, and she testified that that *particular* lineup did not include a picture of Appellant and that Powell was unable to identify anyone in the lineup. Detective Redlinger's testimony was therefore not misleading, and Appellant's counsel was not deficient in failing to "correct" it. Furthermore, if there was any confusion, Appellant has failed to show prejudice, because the prosecutor told the jury explicitly during closing arguments that Powell's testimony about picking out Appellant in a photographic lineup was incorrect and that Powell was shown a lineup that contained Appellant's picture and he was unable to identify Appellant.

Appellant also claims that his trial counsel was ineffective in failing to object on either hearsay or Confrontation Clause grounds to certain testimony by Detective Redlinger. Appellant first argues that his counsel should have

17

objected when the prosecutor questioned Detective Redlinger about whether her investigation had connected the name "Lil' Chris" to Appellant. At the first trial, however, the State had brought in a witness who directly tied Appellant to the nickname "Little Chris." Counsel's refraining at the second trial from objecting to the detective's testimony directly linking Appellant to the nickname was a strategic decision that Appellant has not shown was unreasonable or caused prejudice, particularly in the absence of evidence that the witness called at the first trial was unavailable to testify at the second trial. See Hartsfield v. State, 294 Ga. 883, 889 (757 SE2d 90) (2014) (explaining that "it was a reasonable trial strategy not to object [to the hearsay] because if the objection had been sustained, the State could have called the declarants to testify.").

Appellant finally contends that his trial counsel should have objected when Detective Redlinger testified that during the course of her investigation, she identified two other persons of interest from College Park named Chris but ultimately "was able to verify that they did not have involvement [in the shooting], or there was no evidence to suggest that they had any involvement, . . . based on interviewing and alibis." This testimony was not clearly hearsay or subject to a Confrontation Clause objection, because the detective did not

18

repeat the substance of what someone else told her but rather explained summarily why she had concluded that the other two men named Chris were not viable suspects. See Johnson v. State, 289 Ga. 22, 26-27 (709 SE2d 217) (2011). Moreover, even assuming that some aspect of this testimony was inadmissible, no prejudice has been established because Appellant failed to show a reasonable probability that the absence of the disputed testimony would have changed the outcome of his trial, as there is no evidence that either of the other two Chrises actually had something to do with the shooting at Quan's house.

Accordingly, these ineffective assistance claims also fail.

4. A sentencing error involving merger of counts may be corrected on appeal even if the issue was not raised by the parties. See Hulett v. State, 296 Ga. 49, 54 (766 SE2d 1) (2014). As set out in footnote 1 above, the jury found Appellant guilty of malice murder, three counts of felony murder, armed robbery, two counts of aggravated assault, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a crime. The trial court sentenced Appellant only for malice murder, the aggravated assault of Powell, and possession of a firearm during the commission of a crime,

19

merging the armed robbery, aggravated assault of Roland, and possession of a firearm by a convicted felon counts into the felony murder counts that were based on those felonies. Upon conviction of the malice murder count involving the same victim, however, the felony murder counts were vacated by operation of law, and having been vacated, no other count could be merged into them. See id. at 53.

Nevertheless, the aggravated assault of Roland (the murder victim) merged into the *malice* murder count as a matter of fact. See id. at 55. Thus, the trial court did not err by not entering a sentence on that aggravated assault count. However, the court erred in not sentencing Appellant for the armed robbery (Count 5) and for possession of a firearm by a convicted felon (Count 8), which did not merge into the malice murder conviction. See id. at 55-56. Accordingly, we vacate the trial court's judgment in part and remand the case for Appellant to be sentenced on those two counts. See id. at 56.

Judgment affirmed in part and vacated in part, and case remanded with direction. All the Justices concur.