NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: August 21, 2023

S23A0508.  MOULDER v. THE STATE.

WARREN, Justice.

In March 2015, Joshua Moulder was convicted of malice murder, armed robbery, and possession of a firearm during the commission of a felony in connection with the July 2006 shooting death of Anthony Rudolph and was also convicted of influencing a witness in 2014.  He appeals those convictions, arguing that the evidence was not sufficient to support his convictions related to the 2006 shooting and that counsel provided ineffective assistance by: not arguing that the State failed to prove the statute of limitation tolling provision alleged for the non-murder crimes committed in 2006; failing to raise a hearsay and Confrontation Clause objection to certain testimony given by the lead detective; failing to correctly advise Moulder about whether his prior convictions could be used to

impeach him if he testified; inaccurately describing the reasonable-doubt standard in closing argument; and failing to object to a jury charge about statements made during formal court proceedings. Because the evidence was sufficient to support Moulder's convictions and he has failed to prove his claims of ineffective assistance of counsel, we affirm.[1]

1. Viewed in the light most favorable to the verdicts, the evidence presented at Moulder's trial showed the following. In November 2005, Rudolph was released on parole from an Ohio prison and started living in Cleveland, Ohio. In July 2006, Rudolph

---

[1] Rudolph was killed in July 2006. In March 2015, a Cobb County grand jury indicted Moulder for malice murder, four counts of felony murder, aggravated assault, two counts of armed robbery, and possession of a firearm during the commission of a felony, all in connection with Rudolph's July 2006 shooting, and one count of influencing a witness based on Moulder's actions toward Aletha Hughes in December 2014. At a trial from June 18 to 28, 2018, the jury found Moulder guilty on all counts. The court sentenced him to serve two sentences of life in prison—one for malice murder and one for armed robbery—five consecutive years in prison for the firearm possession count, and ten concurrent years for influencing a witness. The remaining counts were merged or vacated by operation of law. Moulder timely moved for a new trial, which he later amended twice with new counsel. In October 2022, after an evidentiary hearing, the trial court denied Moulder's motion. He filed a timely notice of appeal. The case was docketed to the April 2023 term of this Court and orally argued on April 20, 2023.

told his friend Clarence Marshall that he was going to drive to Atlanta with "this guy that he met in the penitentiary called 'Youngster'" for a drug deal; that he and Youngster were each going to contribute $15,000; and that Youngster was from the Atlanta area and had been paroled to Dayton, Ohio, in May or June 2006.[2] Similarly, Rudolph told his sister that he was going to pick up a friend, "Youngster or somebody," in Xenia, Ohio.[3]

On July 18, 2006, Rudolph rented a car in Ohio, and at 6:15 a.m. on July 20, he rented a hotel room in Cobb County, Georgia for one night. The next day, a man, whom the hotel staff could not describe, extended the room rental for another night. On July 21, Rudolph called Marshall, "sound[ing] kind of upset," and said that "he was supposed to be home by now." Rudolph also said that he and Youngster were in a hotel room, and Marshall heard a man

---

[2] Marshall also testified that Rudolph said Youngster had gotten in trouble in prison for throwing a heated towel in an inmate's face. The lead detective in Moulder's case admitted that there was no record of Moulder doing that.

[3] An Ohio-based investigator testified at trial that Xenia is a suburb of Dayton.

3

laughing in the background. Marshall called Rudolph back a few hours later because he had "never seen [Rudolph] upset" or "heard him talk like that," but Rudolph did not answer.

On July 22, after the 11:00 a.m. hotel check-out time had passed and housekeeping had knocked on the door of Rudolph's room but gotten no reply, the hotel manager called the police. Responding police officers discovered Rudolph lying in one of the two beds in the room. He had been killed by a gunshot to the back of his head. The murder weapon was never recovered, but a firearms expert testified that the bullet was fired from a revolver. According to his sister, Rudolph had a wallet, but no wallet or money (other than three dimes) was found in the room. Rudolph's cell phone was also not found. The hotel room door had been locked, there were no signs of a struggle, and Rudolph looked like he had been sleeping when shot, which led Detective Mitchell Plumb—the lead detective on the case—to conclude that Rudolph knew his shooter. The car Rudolph had rented was found outside a boarded-up apartment complex. Detective Plumb testified that a trail from the apartment complex

4

through the woods "led directly to where one of Moulder's family lived at in an apartment." That location was also about 1,000 feet from an address where Moulder used to live.

Moulder, who was from the Atlanta area but had served time in prison with Rudolph in Ohio, was released on parole in May 2006 and began living in Xenia, Ohio. He was between 12 and 14 years younger than Rudolph. Rudolph's phone records showed that his phone called Moulder's sister's phone seven times on the morning of July 20, beginning at 4:19 a.m. Moulder's sister told Detective Plumb that Moulder had called her from a blocked number and asked if she needed any money; she said no. The sister testified that some time after the call, she saw Moulder at their mother's house in Georgia. Detective Plumb contacted law enforcement officials in Ohio, and on July 28, they located and arrested Moulder for violating his parole by possessing crack cocaine, among other reasons. When he was arrested, he had a "little over $800" in his pocket.

Detective Plumb interviewed Moulder in Ohio.[4]  Moulder told Detective Plumb that he had served time with and was good friends with Rudolph and that he knew Rudolph was traveling south with another person for a drug deal.  The detective suggested that the other person was called "Youngster," and Moulder agreed.  Moulder further explained that Youngster had set up the deal and although Moulder gave Rudolph $1250 to be used in the deal, he did not go with Youngster and Rudolph to complete the transaction.  Moulder maintained that he had not left Ohio during the period of time in which the drug deal and Rudolph's murder occurred in Atlanta.

When asked to describe "Youngster," Moulder said that Youngster had been housed in a different prison pod than the one he and Rudolph lived in and described Youngster as "short" and "dark skinned" with two gold teeth and "'Youngster' tattooed across his shoulder blades."  Detective Plumb was not able to identify

---

[4] This interview was video-recorded and played for the jury.

Youngster based on this information.[5]  He and several other witnesses called by the State testified that Moulder was not known by the alias or nickname "Youngster."  After about one year, the case went cold.

In 2013, the case was picked up by a cold-case investigator, who reached out to Aletha Hughes, who was dating Moulder at the time of the crimes in 2006 but who had since separated from Moulder and moved to Indiana.  Hughes traveled to Georgia and gave a statement to the District Attorney's office on December 18, 2014.[6]  Her statement was consistent with her trial testimony, which was as

---

[5] At trial, Detective Plumb testified that he gave Moulder's description of "Youngster" to "Ohio Corrections."  He was told that there were several people in the prison system known as "Youngster," but there was no one matching the description Moulder gave.  This testimony is a subject of one of Moulder's claims of ineffective assistance of counsel, discussed in Division 3 (b) below.

[6] When Hughes arrived in Georgia on December 17, Moulder sent her a text message saying that he had also traveled to Georgia.  He asked her what hotel she was staying in, offered to hire her a lawyer, told her that she did not need to talk to the police, and told her she should ride back from Georgia with him.  Hughes testified that Moulder's messages and his presence in Georgia "scared" her.  After Moulder was arrested, he sent Hughes letters that she testified had "undertones of threats."

follows. On the evening of July 21, 2006, Moulder called her "in an urgency" and said that he was at his mother's house in Georgia and needed Hughes "to come get him now." Hughes did not have enough money to drive from Ohio to Georgia, so Moulder's mother wired her money, which Hughes used to rent a car. She started driving that night, arriving in Georgia by "the early morning hours" of July 22. She met Moulder, who did not have any belongings with him, in a parking lot, and then they "immediately" drove back to Ohio.[7]

Hughes also testified that about two weeks before she drove to Georgia, Moulder showed her a revolver, and shortly before he left, he told her that "he and his buddy from prison [were] going somewhere." She testified that when Moulder was told soon after he got back from his trip that police were looking for him, he told Hughes that "something had happened to his friend, and they wanted to question him about it." She asked him, "did he do it, and he said no." When she said he needed to talk to the police, Moulder

---

[7] The investigator who interviewed Hughes testified that she said she arrived in Georgia at 4:30 a.m. and left "after just a short period of time."

responded, "F\*\*k the police." Hughes had not given the police this information in 2006 because she had "loved" and "trusted" Moulder.

On December 19, 2014, Moulder was arrested for Rudolph's murder. Moulder did not testify at trial. His defense was that he was not "Youngster," and that even if he was in Georgia at the time of the crimes, the State had not proven that he traveled to Georgia with Rudolph or was ever in Rudolph's hotel room; Moulder emphasized the lack of forensic evidence at the scene of Rudolph's murder and argued that the State had not completed a thorough investigation.

2. Moulder argues that the evidence presented at trial was not sufficient to support his convictions for the crimes allegedly committed in 2006 under *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LEd2d 560) (1979).[8] In evaluating the sufficiency of the evidence as a matter of constitutional due process, we view all of the evidence presented at trial in the light most favorable to the verdicts

_____

[8] Moulder does not challenge the sufficiency of the evidence supporting his conviction for influencing a witness in 2014.

and consider whether any rational juror could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson*, 443 U.S. at 319; *Clark v. State*, 315 Ga. 423, 427 (883 SE2d 317) (2023). "We leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts." *Clark*, 315 Ga. at 427 (citation and punctuation omitted). Moulder also challenges his convictions for the 2006 crimes under OCGA § 24-14-6, which says: "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." "Whether a hypothesis is reasonable or not is for the jury to decide." *Davenport v. State*, 309 Ga. 385, 388-389 (846 SE2d 83) (2020) (citation and punctuation omitted).

The evidence discussed above was sufficient to support Moulder's convictions as a matter of federal due process under *Jackson*. The evidence was also sufficient as a matter of Georgia

statutory law under OCGA § 24-14-6 to support the jury's rejection of Moulder's hypothesis that he was not "Youngster" and that Youngster (not Moulder) killed Rudolph. See, e.g., *Winston v. State*, 303 Ga. 604, 607 (814 SE2d 408) (2018) (holding that the evidence was sufficient under *Jackson* and OCGA § 24-14-6, where "the evidence showed appellant was the last person known to be with the victim at the time the killing took place").

3. Moulder next argues that his counsel provided ineffective assistance in five ways. To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed their duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms." *Bates v. State*, 313 Ga. 57, 62 (867 SE2d 140) (2022). See also *Strickland*, 466 U.S. at

11

687-688. To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Bates*, 313 Ga. at 63.

(a) At trial, the State alleged that OCGA § 17-3-2 (1) applied to toll the seven- and four-year statutes of limitation that would have otherwise barred prosecution of the non-murder crimes from 2006 for which Moulder was charged.[9] The jury found Moulder guilty of those crimes, indicating that it found that the State had proven that the tolling provision it alleged applied. Moulder contends that the evidence did not support the allegation that OCGA § 17-3-2 (1) applied and argues that his trial counsel provided

---

[9] OCGA § 17-3-2 says: "The period within which a prosecution must be commenced under Code Section 17-3-1 or other applicable statute does not include any period in which: (1) The accused is not usually and publicly a resident within this state."

12

ineffective assistance by failing to make that argument at trial.

> In criminal cases, the statute of limitation runs . . . from the time of the criminal act to the time of indictment. Where an exception is relied upon to prevent the bar of the statute of limitation[ ], it must be alleged and proved. Indeed, the State bears the burden at trial to prove that a crime occurred within the statute of limitation, or, if an exception to the statute is alleged, to prove that the case properly falls within the exception.

*Taylor v. State*, 306 Ga. 277, 286 (830 SE2d 90) (2019) (citations and punctuation omitted).

Based on actions Moulder allegedly committed with respect to Rudolph in July 2006, the grand jury charged Moulder in March 2015 with two counts of armed robbery, which has a seven-year statute of limitation, see OCGA § 17-3-1 (b), and possession of a firearm during the commission of a crime, which has a four-year statute of limitation, see OCGA § 17-3-1 (c).[10] It is undisputed that

---

[10] OCGA § 17-3-1 (b) provides a seven-year limitation period for "crimes punishable by death or life imprisonment," and armed robbery is punishable by life in prison, see OCGA § 16-8-41 (b). OCGA § 17-3-1 (c) provides a four-year limitation period for other felonies. Moulder was also charged with aggravated assault, but Moulder's claim of ineffective assistance of counsel as to that count is moot because that count merged into Moulder's conviction for murder. See *Sims v. State*, 312 Ga. 322, 330 (862 SE2d 534) (2021) ("[B]ecause no conviction was entered on Sims's aggravated assault charge, his ineffective

13

those crimes were indicted after their respective limitation periods had run, but the State alleged in the indictment that OCGA § 17-3-2 (1) tolled the statutes of limitation because Moulder was "not usually and publicly a resident within the State of Georgia from July 21, 2006 through December 18, 2014."

Although the jury was not given a specific instruction about the alleged tolling provision, the jury was instructed that the State had "to prove every material allegation of the indictment." See *Taylor*, 306 Ga. at 286 (explaining that a tolling allegation is a "material allegation"). The prosecutor noted in his closing argument that the State had to prove the tolling provision alleged, and argued that the State met this obligation because it had proven that Moulder "went back to Ohio" and was not in Georgia "from 2006 to 2014."

Moulder's trial counsel did not mention tolling in his closing argument. And although Moulder does not contest that he stayed

---

assistance claim is moot to the extent that trial counsel's alleged ineffectiveness relates to that crime[.]"). Murder has no limitation period. See OCGA § 17-3-1 (a).

14

in Ohio during the alleged tolling period, he contends that his counsel's failure to argue that the evidence failed to show that he "absconded" from Georgia to Ohio constituted ineffective assistance because if counsel had made such an argument, the jury would have concluded that the State failed to prove the alleged tolling provision and would not have found Moulder guilty of the 2006 non-murder crimes.

As noted above, OCGA § 17-3-2 (1) tolls the period within which a prosecution must be commenced for "any period" in which "[t]he accused is not usually and publicly a resident within this State." This Court has explained that under this provision, "[i]f the offender shall abscond from this State, or so conceal himself that he cannot be arrested, such time during which he has been absent from the State, or concealed, shall not be computed or constitute any part of said several limitations." *Danuel v. State*, 262 Ga. 349, 352 (418 SE2d 45) (1992). *Danuel* defined "abscond" as

> "To go in a clandestine manner out of the jurisdiction of the courts, or to lie concealed, in order to avoid their process. To hide, conceal, or absent oneself clandestinely,

15

> with the intent to avoid legal process. Postponing limitations. Fleeing from arresting or prosecuting officers of this state."

Id. (citing Black's Law Dictionary, 5th Edition).[11]

As shown in the evidence discussed above, the State presented strong evidence from which the jury could conclude that Moulder "absconded" from Georgia. See *Danuel*, 262 Ga. at 352. He called his girlfriend to pick him up "in an urgency." His mother wired his girlfriend money so she could make the drive that night. She drove through the night, arrived in the early morning hours, and met him in a parking lot. They then drove back to Ohio "immediately." Given this evidence, even assuming counsel was deficient for not raising an argument that Moulder did not "abscond," Moulder has failed to show that there is a reasonable probability the jury would have been persuaded by any such argument. See *Vasquez v. State*,

---

[11] *Danuel* interpreted a former version of OCGA § 17-3-2 (1), but we have held that the former version has the same meaning as the current statute. See *Vasquez v. State*, 306 Ga. 216, 224 (830 SE2d 143) (2019) (citing *Danuel*, 262 Ga. at 251). The District Attorney asks us to overrule *Danuel* and conclude that there is no abscondment or concealment requirement in OCGA § 17-3-2 (1), but because Moulder's claim fails even under *Danuel*, we decline to consider the State's request.

306 Ga. 216, 218-219, 224 (830 SE2d 143) (2019) (holding that the evidence "authorized the jury to determine that Vasquez had absconded and that the statute of limitation was tolled" when the defendant and his wife left their Georgia home with "food on the table" and "clothing strewn about the house" and went to Mexico, did not tell any family members they were leaving, and later lied to family members about their reason for being in Mexico).[12]  Thus, Moulder has failed to demonstrate prejudice, and his claim of ineffective assistance fails.  See, e.g., *Mathews v. State*, 314 Ga. 360, 369 (877 SE2d 188) (2022) (holding that counsel did not provide ineffective assistance by failing to argue to the jury that the evidence failed to prove that the appellant acted as a party to the crime where there was strong evidence of the appellant's guilt); *Gaston v. State*,

---

[12] Moulder argues that there is no evidence that he concealed himself while he was in Ohio.  However, under *Danuel*, the State does not have to prove concealment for this tolling statute to apply.  See *Danuel*, 262 Ga. at 352 (explaining that the former OCGA § 17-3-2 (1) applied "[i]f the offender shall abscond from this State, *or* so conceal himself that he cannot be arrested") (Emphasis added, citation and punctuation omitted).  As discussed above, there was compelling evidence that Moulder absconded from Georgia's jurisdiction.

17

307 Ga. 634, 638 (837 SE2d 808) (2020) (holding that the appellant failed to prove prejudice based on counsel's failure to request a self-defense instruction because there was strong evidence disproving self-defense).[13]

(b) Moulder next argues that trial counsel provided ineffective assistance by failing to raise hearsay and Confrontation Clause objections to testimony from Detective Plumb. On direct examination, the State asked Detective Plumb, "what, if anything, [he] did during the course of [his] investigation" to "look into the defendant's assertions that there was a third party, Youngster, who was not him." The detective responded:

> Mr. Moulder gave me a description. So I contacted the Ohio Corrections, their intelligence unit in which they record all kinds of data about every prisoner that goes through the prison system. One of the things they do record are tattoos. They record those just like fingerprints. And I provided him with the—the physical

[13] To the extent Moulder claims counsel should have moved for a directed verdict based on the State's failure to prove tolling of the statutes of limitation, this contention also fails because the evidence authorized the jury to conclude that he absconded. See *Mathews*, 314 Ga. at 369 (rejecting the appellant's claim that counsel provided ineffective assistance by failing to move for a directed verdict because there was sufficient evidence to support his convictions).

18

description: Shorter than Moulder, tattoo on his shoulder, black male, and provided that to them. And they were able to identify several Youngster names, but never anyone with a tattoo or associated with the pod that he referenced to.

Even assuming that the detective's testimony that prison officials were unable to find someone matching Moulder's description of "Youngster" was hearsay and a violation of the Confrontation Clause contained in the Sixth Amendment to the United States Constitution, Moulder has failed to show that no reasonable attorney would have failed to object to this testimony.

"[R]easonable decisions as to whether to raise a specific objection are ordinarily matters of trial strategy and provide no ground for reversal." *Bates*, 313 Ga. at 67 (citation and punctuation omitted). Although the detective's testimony somewhat undermined Moulder's argument that he was not "Youngster," insofar as it revealed that Moulder's description of Youngster did not match any records from the Ohio correction system, not all of the alleged hearsay was detrimental to Moulder. To that end, the detective also said that the prison official he spoke with identified several people

19

named Youngster, which supported Moulder's argument that he was *not* Youngster—by showing that other people in the prison used the name Youngster and could have been the person to whom Rudolph was referring, notwithstanding the fact that they did not match every detail given by Moulder.

Also, in closing argument, counsel explained to the jury that he did not raise "a constant bunch of objections, because . . . I wanted you to hear the evidence." By not objecting to the detective's testimony, counsel allowed the jury to hear about the investigation the State had done to find "Youngster," and then emphasized in his closing argument that the investigation was not sufficient. For example, counsel pointed out that the State did not ask for prison records to try to find a person who (unlike Moulder) matched Marshall's description of Youngster as someone who got in trouble in prison for throwing a heated towel in someone's face. Counsel also noted that the State did not ask the Ohio Department of Corrections for contact information for people who knew Rudolph and could have been asked to identify Youngster, and suggested that

20

the State should have asked prison guards if they remembered the housing pod Rudolph was in and the other people who were also housed in it.

Thus, there was a reasonable strategic reason for counsel not to object to the detective's fairly summary statement that an unnamed person from the "intelligence unit" in "Ohio Corrections" could not find anyone matching Moulder's physical description of Youngster. See *Fuller v. State*, 316 Ga. 127, 131 (886 SE2d 798) (2023) (holding that counsel's performance was not deficient by failing to raise a "best evidence" objection to testimony about a message the appellant allegedly sent when counsel "emphasized the missing message to the jury in support of his broader argument attacking [the witness's] credibility and the sufficiency of the State's investigation into the case"); *Bates*, 313 Ga. at 67 (holding that counsel's performance was not deficient where he made a strategic decision not to object to a witness because, although the witness gave some testimony that was detrimental to the appellant, counsel was able to cross-examine the witness and "elicit helpful

21

testimony"); *Marshall v. State*, 299 Ga. 825, 827 (792 SE2d 350) (2016) (holding that counsel's performance was not deficient where he did not object to the introduction of pretrial statements of two witnesses "based on his determination that the recordings were more damaging to these witnesses' overall credibility than they were corroborative of their trial testimony").[14]

Moreover, Moulder has failed to prove prejudice because he has failed to show that if counsel had raised an objection, the State could not have rephrased the question to elicit the same information without relying on hearsay. See *Smith v. State*, 298 Ga. 406, 415 (782 SE2d 269) (2016) (concluding that a detective's testimony that she identified two other persons of interest named Chris but

---

[14] Moulder points out that at the motion-for-new-trial hearing, counsel testified, "If I failed to object to hearsay, then obviously, I made a mistake," and said that he "hoped" he preserved the objection with a motion in limine he filed objecting to other out-of-court statements. However,

> we are not limited in our assessment of the objective reasonableness of lawyer performance to the subjective reasons offered by trial counsel for his conduct. If a reasonable lawyer might have done what the actual lawyer did—whether for the same reasons given by the actual lawyer or different reasons entirely—the actual lawyer cannot be said to have performed in an objectively unreasonable way.

*Hurt v. State*, 298 Ga. 51, 57 (779 SE2d 313) (2015).

ultimately "was able to verify that they did not have involvement" in the crimes was not clearly hearsay or subject to a Confrontation Clause objection, because the detective did not repeat the substance of what someone else told her but rather explained summarily why she had concluded that the other two men named Chris were not viable suspects). See also *Davis v. State*, 306 Ga. 140, 149 (829 SE2d 321) (2019) (holding that the appellant failed to prove prejudice from counsel's failure to object to leading questions "because an objection likely would not have prevented the admission of the testimony, either because the trial court would have permitted the questions to be answered . . . or because the prosecutor could have rephrased his questions"). Thus, this claim of ineffective assistance of counsel fails.

(c)  Moulder argues that his counsel provided ineffective assistance by failing properly to advise Moulder about whether his prior convictions could be used to impeach him if he testified. OCGA § 24-6-609 pertains to impeachment by conviction of a crime, and subsection (b) says, with emphasis added:

Evidence of a conviction under this Code section *shall not be admissible if a period of more than ten years has elapsed* since the date of the conviction or of the release of the witness from the confinement imposed for such conviction, whichever is the later date, *unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.* However, evidence of a conviction more than ten years old, as calculated in this subsection, shall not be admissible unless the *proponent gives to the adverse party sufficient advance written notice of intent to use* such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

Before trial, the State filed a "Disclosure Certificate," which stated that "[a]ll convictions will be used . . . for impeachment pursuant to OCGA § 24-6-609." At the time of his trial in 2018, Moulder had three prior felony convictions: robbery in October 1999 and tampering with evidence and conspiracy to commit aggravated burglary in August 2000. There was no clear evidence presented as to when Moulder was released from "confinement imposed for [these] convictions," but we will assume for the sake of this argument that it was more than 10 years before trial.

At the close of the State's evidence at trial, Moulder's counsel

24

informed the court that he had spoken to Moulder about Moulder's right to testify and "advised him that if he testifies, the State has a right to cross-examine him, and that the State could attempt to impeach him with some of his prior convictions." Moulder confirmed that he and his lawyer had "talked about all that," and Moulder informed the court that he had chosen not to testify.

At the motion for new trial hearing, trial counsel testified that he told Moulder that "if he chose to testify, the State could attempt to impeach him with his criminal history," and counsel testified that his understanding was that if a conviction is older than ten years, it is "the court's discretion to let it in." Moulder testified at the motion-for-new-trial hearing that the "sole reason" he did not testify at trial was because his counsel told him, "You take the stand, they're going to bring up your past." In denying Moulder's motion for new trial, the trial court concluded that Moulder's counsel "properly advised him" about this issue.

Moulder has failed to demonstrate that his counsel performed deficiently in providing advice on this issue. On the contrary,

25

counsel's statement that the State "could attempt" to use Moulder's prior convictions as impeachment was correct. See OCGA § 24-6-609 (b) (providing that the court can admit such convictions if "the court determines, in the interests of justice, that the probative value of the conviction . . . substantially outweighs its prejudicial effect" and the proponent has given sufficient advance written notice). And it was reasonable for counsel to share this information with Moulder as something Moulder should consider in deciding whether to testify. Thus, Moulder's claim of ineffective assistance of counsel fails. See *Warren v. State*, 314 Ga. 598, 604 (878 SE2d 438) (2022) (denying the appellant's claim of ineffective assistance of counsel and explaining, "it is generally enough for counsel to advise the defendant about the 'pros and cons' of testifying and explain that the ultimate choice is the defendant's to make, whether the defendant testifies and then regrets it . . . or does not testify and later wishes he had").

(d) Moulder argues that his trial counsel provided ineffective assistance by misrepresenting the reasonable-doubt standard with

the following italicized statements.   Near the beginning of his closing argument, counsel said:

> [I]t boils down to this. If—if they have proven to you, beyond a reasonable doubt, and there's no fancy words for *beyond a reasonable doubt, what does your gut say to you? If your gut says, "You know what?  I know he did it," then find him guilty.*  If you go back there and you deliberate and you say, "Well, this—this just really doesn't make sense to me," then he's not guilty.

At the end of his argument, counsel said:

> *[I]f your heart of hearts says he did it when you back there, find him guilty.*  But I suspect when you go back and you look at everything logically, you'll agree with me that there isn't any proof that he did this.  And there's a lot out there that you just don't know, which would have been helpful.

At the motion-for-new-trial hearing, Moulder's trial counsel testified: "I did not believe, based on the evidence that was presented, that [the jurors] would find, in their heart of hearts, that [Moulder] did it, and I knew that the court was going to instruct the jury as to the law."[15]

---

[15] The trial court charged the jury that it was the court's duty "to instruct you on that law" and that "opening or closing remarks of the attorneys or questions asked by the attorneys" were not evidence.  The court also defined

With respect to closing argument, "defense counsel is permitted wide latitude . . . and is not ineffective simply because another attorney might have used different language or placed a different emphasis on the evidence." *Anthony v. State*, 311 Ga. 293, 298 (857 SE2d 682) (2021).  Furthermore, "a closing argument is to be judged in the context in which it is made."  Id.  Here, reading counsel's closing argument as a whole, counsel used the phrases at issue to emphasize the lack of evidence presented by the State, knowing that the trial court would instruct the jury on the legal definition of reasonable doubt.  Moulder has not overcome the strong presumption that counsel's performance fell within the wide range of reasonable professional assistance.  See, e.g., *Anthony*, 311 Ga. at 298 (holding that counsel's strategic decision to concede in closing argument that his client was guilty of lesser charges and focus on

---

reasonable doubt:

> A reasonable doubt means just what it says.  A reasonable doubt is a doubt of a fair-minded, impartial juror honestly seeking the truth.  A reasonable doubt is a doubt based upon common sense and reason.  It does not mean a vague or arbitrary doubt, but is a doubt for which a reason can be given arising from a consideration of the evidence, a lack of evidence or a conflict in the evidence.

arguing that his client did not have the intent for malice murder was not deficient).

(e) Finally, Moulder argues that counsel provided ineffective assistance by not objecting to a jury charge about statements of fact made during formal court proceedings. At trial, Moulder's counsel requested the following jury instruction: "An admission in judicio is binding and conclusive as to the party who made it." The trial court agreed to give the instruction but modified it slightly, without objection from trial counsel, and instructed the jury: "Statements of fact made during formal court proceedings are binding and conclusive as against the party who made them."

In his closing argument, trial counsel discussed evidence about the inconsistency between Moulder's December 18 arrest warrant—in which Detective Plumb "swore under oath" that Moulder shot the victim—and a December 20 search warrant affidavit—for which Detective Plumb gave information to an Ohio police officer, who "swore under oath" that "the victim was shot and killed by an unknown suspect." Counsel then explained:

I ask[ed] for a jury charge, and it's basically called admission in judicio; right? You swear under oath that something is true, then—then it can be held against you. They swore under oath that an unknown suspect killed Anthony Rudolph one day after they swore under oath that Joshua Moulder did it. Statements of facts made during formal court proceedings are binding and conclusive as against the party who made them. . . .

So the police swore under oath that he's the shooter one day. And then the next day, they say an unknown suspect shot him. And that also was under oath. . . .

Why is there a difference? Because here's the thing. In the federal level when they go to arrest somebody, they have all their ducks in a row. They essentially nailed down their case. They are going to arrest you and prepare the indictment immediately. . . . But see, in the state system, they arrest and then they investigate.

At the motion-for-new-trial hearing, counsel explained that he requested this instruction because he wanted to highlight inconsistencies in affidavits completed by investigators.

"Decisions on requests to charge involve trial tactics to which we must afford substantial latitude, and they provide no grounds for reversal unless such tactical decisions are so patently unreasonable that no competent attorney would have chosen them." *Smith v. State*, 306 Ga. 556, 558 (832 SE2d 379) (2019). Moulder has not shown that counsel's tactical decision was patently unreasonable.

30

Counsel requested the instruction to make an argument about the warrants, and in closing, he used the instruction to argue that the police's swearing under oath that the shooter was unknown undermined the validity of their identification of Moulder as the shooter and of their overall investigation.[16] Because this was not a patently unreasonable strategy, Moulder's claim of ineffective assistance of counsel fails. See *Daughtie v. State*, 297 Ga. 261, 266 (773 SE2d 263) (2015) ("The fact that another attorney may have pursued a different strategy does not render trial counsel ineffective.").[17]

---

[16] Moulder argues that because he was a "party" in the case, the instruction led the jury to credit Moulder's statements against him, such as his statements to Hughes that something happened to his friend. However, none of Moulder's out-of-court statements were made during "formal court proceedings," and there is no indication in the record that the jury applied the instruction as Moulder fears. See *Nundra v. State*, 316 Ga. 1, 16 (885 SE2d 790) (2023) ("We typically presume juries follow the instructions that they are given by the trial court, absent evidence to the contrary.").

[17] Moulder argues that the deficiencies he has alleged in his claims of ineffective assistance, when viewed in the aggregate, prejudiced his trial. See *Lewis v. State*, 312 Ga. 537, 547 (863 SE2d 65) (2021) ("It is the prejudice arising from counsel's errors that is constitutionally relevant, not that each individual error by counsel should be considered in a vacuum."). However, we have assumed counsel's deficiency with respect to a single claim of ineffective assistance and concluded that counsel was not deficient in any other respect.

*Judgment affirmed.  All the Justices concur.*

---

Therefore, this claim presents nothing additional for us to review.  See, e.g., *Wynn v. State*, 313 Ga. 827, 840-841 (874 SE2d 42) (2022) (concluding in the context of the evaluation of the cumulative effect of alleged trial court errors, that "there is no basis for evaluating the cumulative effect of errors because we have identified only one error and rejected Wynn's other claims").